FRED J. GOULD, Appellant, v. JOHN P. ST. JOHN and W. W. NOYES.

Division Two, December 10, 1907.

1. **NEW TRIAL: No Evidence.** The trial court has a right to grant a new trial on the ground that the verdict for plaintiff was against the weight of the evidence, or on the ground that there was no evidence to sustain the verdict, unless it abuses its discretion in so doing.

2. ———: ———: **Discretion.** Trial courts have large discretionary powers in granting new trials, especially where the weight of the evidence is involved; and the Supreme Court will not interfere with the exercise of that power unless it appears that it was unwisely exercised.

3. ———: **Preponderance of Evidence.** Where the evidence does not preponderate in favor of the plaintiff, it is not only the province of the trial court to set aside the verdict for plaintiff and grant defendants a new trial, but it is its plain duty to do so.

4. ———: **Presumption.** A presumption is always to be indulged in favor of the correctness of the order of the trial court granting a new trial.

Gould v. St. John.

5. ———: **Real Estate Agent: Commissions.** In this case plaintiff recovered judgment for $5,654.50 against defendants as his alleged part of the profits received by defendants for selling certain coal lands, under an agreement that he was to receive one-half of the profits made by defendants in the sale of lands to customers brought or sent by plaintiff to them, and the question at issue was whether the purchasers were procured by plaintiff, and whether defendants had notice of any effort by plaintiff to secure such customers before plaintiff's employment was terminated. The trial court set aside the verdict and granted a new trial on the ground that there was no evidence to sustain it and on the ground that it was against the weight of the evidence, and that action of the court is upheld, not only as being clearly within its discretionary powers, but also as its plain duty, since the evidence does not preponderate in favor of plaintiff.

Appeal from Morgan Circuit Court.—*Hon. Jas. E. Hazell*, Judge.

AFFIRMED.

*Scott J. Miller* with *William Forman* for appellant.

(1) The evidence must be, under a demurrer, most favorably considered to the plaintiff and the testimony on the part of the plaintiff should be taken as true, and every reasonable inference therefrom in plaintiff's favor should be made. Schermerhorn Bros. v. Herold, 81 Mo. App. 461; Dorsey v. Railroad, 83 Mo. App. 528; Steube v. Chritopher, 85 Mo. App. 640; Pauck v. St. Louis Dress Beef Co., 159 Mo. 467. The court was right when it overruled this demurrer at the time of the trial, and was wrong when it had a change of heart and set aside the verdict, for the reason that it should have sustained this demurrer. (2) If there was any evidence in this case on either side tending to prove the issues in plaintiff's petition, the cause should have gone to the jury. Kern v. Legion of Honor, 167 Mo. 485; Wolfe v. Knights & Ladies of Honor, 160 Mo. 675. (3) The evidence of defendant Noyes was sufficient to take this case to the jury. Plaintiff was the

moving cause of the trade.   Leonard v. Roberts, 36
Pac. 882; Loyd v. Mathews, 51 N. Y. 124; Anderson v.
Cox, 16 Neb. 10.   (4)   If the trial court was wrong in
granting the motion for a new trial, the Supreme Court
will correct the trial court's error.   Haven v. Railroad,
165 Mo. 216; Roe v. Bank, 167 Mo. 406.

*John F. Gibbs* and *Moore & Williams* for respond-
ents.

(1)   The contract sued on, being in writing and
without ambiguity, plaintiff's authority as agent or
broker for the sale of real estate is to be ascertained
from the instrument.   Bank v. Schamburg, 38 Mo. 228;
State ex rel. v. Bank, 45 Mo. 528.   This rule is funda-
mental.   2 Parsons on Contracts (5 Ed.), p. 547.   (2)
An agent cannot delegate his authority without the
writing under which he acts gives that power.   This
rule is recognized in all the text-books.   Story, Agency
(7 Ed.), secs. 13, 14 and 34; Bacon Ab., p. 892; 2 Kent
Com. (10 Ed.), p. 892; Ewell's Evans' Agency, p. 38;
1 Am. and Eng. Ency. Law, 972, 978, 1005.   Under this
rule plaintiff has no case.   (3)   (a)   On the evidence
the lower court properly sustained the motion for a new
trial.   Plaintiff did not send or bring any purchaser,
giving due notice, to whom a sale of lands for defend-
ants were made.   He was not the procuring or proxi-
mate cause, and the demurrer was well taken.   Camp-
bell v. Vanstone, 73 Mo. App. 84; Loving Co. v. Cattle
Co., 176 Mo. 330; Pollard v. Banks, 67 Mo. App. 187;
Hayden v. Grillo, 26 Mo. App. 289; Warren v. Cram,
71 Mo. App. 638; McCrory v. Kellogg, 106 Mo. App.
597.   (b)   It is not sufficient that he be one of a chain
of causes, or a remote cause, leading to a sale, if com-
pleted.   Ramsey v. West, 31 Mo. App. 676; Ewell's Ev-
ans on Agency, 341; Ziedler v. Walker, 41 Mo. App.
118; Yoder v. White, 75 Mo. App. 155; Spootswood
v. Morris, 6 L. R. A. 665; Baumgarti v. Hoyen,

54 Ill. App. 502. 1. Under the contract defendants could sell, or employ as many agents or brokers as they saw fit. To be entitled to commissions the broker must be the procuring cause. Dole v. Sherwood, 5 L. R. A. 720; Brannin v. Roach, 47 Mo. App. 290; Wylie v. Bank, 61 N. Y. 415; McClave v. Paine, 49 N. Y. 561; Putman v. How, 39 Mass. 363; Glascock v. Vanfleet, 100 Tenn. 603; Page v. Griffin, 71 Mo. App. 524; Alden v. Emle, 121 N. Y. 688. 2. "A broker who has no exclusive contract or right to sell, is not entitled to a commission by showing that his efforts among others contributed to the sale, and that but for them a sale would not have been made, but he must go further and show that his services were the effective or predominating cause." Whitcombe v. Bacon, 170 Mass. 479. 3. When plaintiff's agency ended, and also agency of defendants for the sale of the lands, on which a commission is claimed, were ended by limitation, before a sale had been consummated, plaintiff had no interest in the labor of defendants in purchasing the lands for a fixed compensation paid by the purchasers. Ramsey v. West, 31 Mo. App. 676; Page v. Griffin, 71 Mo. App. 524; Sibald v. Bethlehem Iron Co., 83 N. Y., 378; Loving v. Cattle Co., 176 Mo. 330; State ex rel. v. Walker, 88 Mo. 279; Green v. Wright, 36 Mo. App. 298. (4) Plaintiff was entitled to no part of the $1309 paid to defendants on account of the option contracts, which were forfeited, even though he had procured the purchasers. Ziedler v. Walker, 41 Mo. App. 118. (5) The representations of plaintiff to the agent who was the procuring cause of the option sale to Magenheimer & Ryan, that he was a partner of defendants, had no foundation in fact or in law; he was simply agent or broker. Hughes v. Ewing, 162 Mo. 285; Durke v. Gunn, 41 Kan. 496; Mackie v. Mott, 146 Mo. 231; Thompson v. Holden, 117 Mo. 118. (6) The lower court properly ruled that the demurrer was well taken.

Had this not been the case, still the new trial was properly granted as a matter of discretion, and this court will not interfere. Herndon v. Lewis, 175 Mo. 116; Hinzeman v. Railroad, 182 Mo. 116; Somerville v. Stockton, 178 Mo. 121; Haven v. Railroad, 155 Mo. 231.

BURGESS, J.—This is an appeal from an order of the circuit court of Morgan county setting aside a verdict for $5,654.50 in favor of the plaintiff, and granting a new trial to defendants, the reasons given by the court for sustaining the motion for a new trial being specifically stated as follows:

"First. Because the court erred in overruling the demurrer to the evidence offered by defendants at the close of plaintiff's case.

"Second. Because the court erred in overruling the demurrer to the evidence offered by defendants at the conclusion of the case.

"Third. Because the verdict is against the weight of the evidence."

The action brought by plaintiff against the defendants was founded upon the following contract:

"Versailles, Mo., Dec. 4, 1902.
"Fred J. Gould, Versailles, Mo.

"Dear Sir:—We will give you one-half of all the gross profits made by us in the sale of any real estate to customers brought or sent us by you. When the party is sent us, you must give them a letter of introduction, or otherwise notify us, before such sale is made that such buyer is your customer. We will pay you your share in each sale as soon as the same is completed. You to transact this class of business in this county solely through our firm. You to bear your own expenses; we to bear ours; this arrangement to be terminated at the will of either of us, but such termination not to interfere with any deal on hand, or otherwise made.                    "Very truly yours,
                    "St. John & Noyes.

"I hereby accept the above conditions and will use my best efforts for the success of the undertaking.

"FRED J. GOULD."

The petition alleges that the defendants had an option on a large tract of land, comprising 5,111 acres, in Morgan county, and known as the "Halderman Tract;" that plaintiff, after having entered into said contract with defendants, began trying to find customers for said land, and did obtain customers to whom defendants sold said land at a profit to the defendants of $37,054.75, for one-half of which sum, $18,527.37, plaintiff prayed judgment.

The defendants, during the years 1902 and 1903, were real estate agents and brokers, with headquarters at Versailles, Morgan county, and plaintiff, who was also a real estate agent, resided at Chillicothe. He came to Versailles in the fall of 1902, and, prior to this contract, had been handling some deals for himself and another party. It appears that, besides the tract of land in question, the defendants had several coal properties for sale. About the date of the contract between plaintiff and defendant there came from Illinois to Versailles some parties who were trying to purchase a coal mine owned by Hubbard & Moore, among them being Sult Brothers, prospective purchasers, and C. W. Waldeck and George H. Lucas, real estate agents. Waldeck, it would appear, came with Sult Brothers to inspect the mine, and Lucas was acting as an agent for Hubbard & Moore, and had become acquainted with Gould, the plaintiff. According to plaintiff's evidence, while negotiations in reference to this Hubbard & Moore coal mine were pending, he got into conversation with Lucas, and mentioned to him the coal lands for sale by defendants, whereupon Lucas said, "Mr. Gould, I can procure some buyers for these coal lands." Plaintiff took Lucas to see Mr. St. John, one of the defendants, and Lucas told St. John that he knew of par-

ties in Peoria who were very much interested in coal. Mr. St. John said, "We will be willing to give you, Mr. Lucas, if you can make a sale to these parties, five per cent." The plaintiff agreed with St. John to bear one-half of said five per cent. It would seem also, according to plaintiff's evidence, that there was an understanding between Lucas and Waldeck that the latter should receive one-half of the said five per cent commission promised by St. John in the event Waldeck secured any purchasers for said land, and that Waldeck and Lucas were practically partners.

The tract of land in question was not sold until some time in 1903, before which time, on February 28, 1903, the contract between plaintiff and defendants had been terminated by the latter, and what part plaintiff took in the negotiations which finally resulted in the sale of the land is shown only in a telegram which, on January 5, 1903, he sent to C. C. Magenheimer, who, with others, purchased said land. Plaintiff had heard of Magenheimer through Lucas and Waldeck. The latter had interested Mr. Magenheimer in the land negotiations, and on January 5th, 1903, he came to St. Louis on business, and while there he accidentally met plaintiff, who, as he supposed, was a partner with St. John & Noyes. Waldeck said to plaintiff, "Magenheimer can't hear a word from St. John & Noyes," and then suggested that he, Gould, send a telegram to Magenheimer, at Peoria, Illinois, which he did. This telegram was as follows:

"St. Louis, Mo., 1-5, 1903.
"C. C. Magenheimer, Peoria, Ill.
"Send on mining engineer to examine coal lands, Morgan county. When can you send him? Answer.
"FRED J. GOULD,
"for ST. JOHN & NOYES."

207 Sup—40

This message was answered by Magenheimer, on January 7th, as follows:

"Peoria, Ill., Jan. 7th, 1903.
"To Fred J. Gould, care of St. John & Noyes,
    "Versailles, Mo.
"Just received message. Will be there first of the week to examine coal lands. Letter.
                "C. C. MAGENHEIMER."

Magenheimer did not know Gould, and before sending him said telegram he inquired of Waldeck who Gould was, and Waldeck told him that he was a partner with St. John & Noyes.

It appears from the evidence on the part of the defendants that St. John first met Waldeck at Versailles at the time the latter, with the other gentlemen mentioned, had come there to look at the Hubbard & Moore property. St. John, who was introduced to Waldeck by the clerk of the hotel where the party stopped, suggested to Waldeck that his firm had several tracts of coal land for sale, specially mentioning a tract of 1,000 acres, known as the "Bailey tract," belonging to a General Hudson, and offering to give Waldeck five per cent commission on all sales to purchasers brought to his firm by him. Waldeck accepted the proposition, stating that he knew of parties in Peoria, Illinois, whom he thought he could interest and influence to purchase this Bailey tract as well as other lands which defendants had for sale. In a day or two Waldeck, with Sult Brothers, left for Illinois, the latter failing to buy the said Hubbard & Moore property. Before leaving, Waldeck made arrangements with St. John to have a description and plat of the Bailey land sent to him at Pekin, Ill., where he resided, and St. John sent him the same a few days after. Shortly after receiving the description and plat of the Bailey land at his home in Pekin, Mr. Waldeck went to Peoria and showed them to C. C. Magenheimer and got him interested as a pros-

pective purchaser of the lands, and wrote a letter on
December 27th to defendants acquainting them with
such facts.   On the same day Magenheimer also wrote
the defendants, stating that a letter sent by them to
Waldeck had been handed to him for answer; that he
was favorably impressed with the proposition therein
stated, and promising to come to Versailles with a min-
ing engineer and examine the coal land after receiving
a reply to his letter.   St. John answered this letter
promptly and invited Magenheimer to come at once.
This letter was misdirected and delayed, so that Magen-
heimer did not get it in due time, and he wrote or tele-
phoned Waldeck that he had not received an answer
to his said letter to St. John.   Waldeck went to St.
Louis, where, as stated before, he accidentally met with
Gould, and, thinking Gould was a partner with St.
John & Noyes, he told him that Magenheimer
had not heard from St. John & Noyes and sug-
gested that he send Magenheimer the telegram here-
tofore referred to.   On January 8, 1903, three days af-
ter receiving said telegram, Magenheimer notified Wal-
deck by letter that he would start for Versailles the
Monday following and see what could be done when he
got there.   Waldeck telephoned defendants on January
13th that he would be there Monday morning with three
parties, and he went to Versailles with Magenheimer
and Mr. Collier, an engineer who accompanied Magen-
heimer to examine the coal property.   With them was
Jeptha Ryan, who came from Leavenworth, Kansas,
and met them at Tipton.   On the arrival of the Magen-
heimer party in Versailles, they were introduced to de-
fendants by Waldeck as his customers, or men whom
he had brought to look at the coal lands.   Gould ap-
peared on the scene after the Magenheimer party had
begun negotiations with the defendants, and, as appears
from the evidence, against the wishes of St. John, Ma-
genheimer and Ryan, joined the party on their visit to

the coal property. They first went to the Bailey coal
land, which was the only property called to their atten-
tion prior to their visit, then to the Hubbard & Moore
mines, and, next day, at the suggestion of St. John, the
party went to the Halderman lands and examined what
was known as the Stover Coal Bank located there. On
the return of the party to Versailles, Magenheimer
and Ryan made an option contract with defendants for
the purchase of the Bailey tract, but afterwards for-
feited the money they had paid on it and the sale was
not completed. At the request of these men, St. John
also negotiated with Hubbard & Moore for a sale of
their property. Hubbard & Moore made the deal, and
Magenheimer and Ryan made a payment of $2,000
thereon, but this deal also fell through, and the money
paid was forfeited. The defendants also, at the time
of this visit, agreed to sell Magenheimer and Ryan the
Halderman tract, being the lands described in plain-
tiff's petition, and on which defendants had an option.
The offer, however, was such that defendants did not
feel authorized to make the contract proposed, and St.
John, therefore, took it to Mrs. Halderman, the owner,
who was at the time at Hot Springs, Arkansas, and got
her signature to the contract which was also signed by
Magenheimer and Ryan. St. John had told Gould some
time in December that his firm had an option on this
Halderman tract, but Gould said that such was not the
fact, as the lands had been sold, and stated that he had
just come from St. Louis, and knew they had been sold
to the ''Hanna crowd''; so that it would seem that
Gould had nothing to do with negotiating the sale of
this tract. The terms of this contract between Mrs.
Halderman and Magenheimer and Ryan do not appear
in evidence, but St. John testified, without contradic-
tion, that the contract of purchase fell through by rea-
son of failure of the purchasers to meet the terms of
payment, and they forfeited the amount paid. After-

wards a second contract was made, but expired late in
the fall of 1903.  After the second contract fell through
the defendants no longer represented Mrs. Halderman,
their option on the land and contract with her having
expired.  Some time afterwards Mrs. Halderman con-
veyed the lands to the Morgan County Coal Company,
which, as appears, was organized by Magenheimer, Ry-
an and the Eberhardt Brothers, of Mishawaka, Indiana,
and this deal was effected by the assistance of Mr. St.
John.  Before this was done, Magenheimer and Ryan
came to St. John, stating that they had been unable to
buy the lands from Mrs. Halderman, and that they had
enlisted the Eberhardt Brothers.  They made a propo-
sition to St. John that if he would go to New York and
succeed in buying the lands for them at a stipulated
price they would give him $10,000.  St. John accepted
the proposition, and after two or three trips to New
York succeeded in buying the property, and Eberhardt
Brothers, who were with Magenheimer and Ryan in
the deal, paid St. John $10,000, which was no part of
the consideration received by Mrs. Halderman, who was
represented in the deal by Mr. Athana, her son-in-law.
Out of the forfeited payments on the previous con-
tracts for the sale of this land St. John & Noyes also
received or retained, as their compensation, the sum
of $1309, sending the remainder of the forfeited money
to Mrs. Halderman.

On the trial, plaintiff Gould claimed that it was his
influence with George H. Lucas and Mr. Waldeck that
resulted in bringing Magenheimer and his associates to
Versailles to look at the lands.  However, in a letter
dated January 22, 1903, written by Magenheimer to the
defendants, in which he enclosed the telegram of Jan-
uary 5th sent him by Gould, he says: "I did not know
Mr. Gould until I received this telegram, but this was
long after our first correspondence and my correspond-
ence and interview with Mr. Waldeck.  I do not con-

sider Mr. Gould in the deal whatever so far as I am concerned. I did not act on this telegram, but upon your own correspondence.''

From the evidence of Lucas, who testified for the plaintiff, it appears that some time after he was at Versailles with Sult Brothers and Mr. Waldeck, and after he had dropped his connection with Hubbard as land agent at Versailles, he wrote St. John to get a contract as agent to find purchasers for lands defendants had for sale, and that he got such contract, the terms of which do not appear in evidence. In a letter dated December 24, 1902, sent to defendants, Lucas names various persons whom he had been trying to interest in the Bailey tract, stating to them that he had no coal lands to sell, and giving to them the address of the defendants who, he said, had coal lands. The letter also stated that Waldeck had seen Magenheimer in Peoria, and that the latter was interested and willing to look at the one thousand acres (Bailey tract) provided he could get an option and take experts to examine the land before buying. This letter was written the same day as that of Waldeck to defendants, and the same day that Magenheimer wrote them proposing to come to Versailles as soon as he could hear from them. But it does not appear that Lucas ever had any correspondence or negotiations with Magenheimer.

It appears from the evidence of Lucas and Waldeck that they had been associated as land agents in some transactions in Illinois, as also in attempting to make a deal for Sult Brothers at the time Lucas met St. John in Versailles, but St. John at the time had no knowledge of such fact. Waldeck said that he intended, on account of their past joint transactions and because they had failed to effect a trade for Sult Brothers, to divide his commission with Lucas on the Bailey tract, if a sale of that tract had been made, and that he so informed the defendants at a later period.

According to St. John's testimony, his firm had never authorized plaintiff Gould to act with Waldeck or to use the name of the firm in sending telegrams or letters. He stated that Gould introduced Lucas to him on the 4th or 5th of December, 1902, and that as Lucas wanted to sell real estate for his firm he offered to give him five per cent commission on all sales made to customers whom he might bring them, but that he did not remember having any agreement whereby Gould was to pay one-half of such five per cent commission and his firm the other half. He also testified that he had met Waldeck and entered into the contract with him in regard to commissions before meeting Lucas.

Many letters and telegrams which passed to and fro between the various parties mentioned in this statement were introduced in evidence, most of which, however, have no bearing upon the issues in this case, and only such as seems pertinent are referred to.

It thus seems that the only question presented by this appeal is whether the action of the court in setting aside the verdict and granting a new trial can be sustained upon either of the grounds assigned by the court for sustaining the motion. In Miller v. Madison Car Co., 130 Mo. 517, it is held that when the trial court, in granting a new trial, recites the reasons therefor as required by section 801, Revised Statutes 1899, it will be presumed on an appeal from such order that the ruling of the court was founded alone on the grounds as stated. In the case at bar, the reasons assigned are, in effect, that there was no evidence to sustain the verdict, and that the verdict was against the weight of the evidence. The court, unless it abused its discretion in so doing, had the right to grant a new trial upon either ground. It is well established that courts, in granting new trials, have large discretionary powers, and especially when the weight of the evidence is involved, and the Supreme Court will not interfere with such dis-

cretion unless it appears to have been unwisely exercised. We do not think the evidence preponderated in favor of the plaintiff, and the court in effect so held in sustaining the motion for a new trial. This being the case, it was not only the province of the court to grant a new trial, but it was its plain duty to do so. [Bank v. Wood, 124 Mo. 72; Taylor v. Railroad, 163 Mo. 183.] In McKay v. Underwood, 47 Mo. 187, it is held that the granting of a new trial on the ground that the verdict is against the weight of the evidence rests peculiarly with the judge presiding at the trial. To the same effect is Baughman v. Fulton, 139 Mo. 557; Iron Mountain Bank v. Armstrong, 92 Mo. 265; Eidemiller v. Kump, 61 Mo. 342; Cook v. Railroad, 56 Mo. 380; Reid v. Ins. Co., 58 Mo. 429. Besides, the presumption is to be indulged in favor of the correctness of the court in granting the new trial, and there is nothing disclosed by the record to overcome this presumption. The judgment is affirmed.

All concur.