OF THE

## STATE OF MISSOURI

AT THE

APRIL TERM, 1914.

*(Continued from Volume* 260.)

SAM B. STROTHER, Administrator of Estate of
    EDWARD B. PARKER, v. KANSAS CITY
    MILLING COMPANY, Appellant.

Division One, July 14, 1914.

1. **APPEAL: From Motion Granting New Trial.** It is assumed,
   and not decided, in this case, where a new trial was granted
   on account of error in defendant's instructions, that a de-
   fendant may appeal from an order granting to plaintiff a new
   trial (and have the order reversed) because plaintiff at the
   trial did not make out a case.

2. **NEGLIGENCE:** Fellow-Servant: Superintendent: Directing
   Work in Hand. A superintendent of a mill, in full control of
   its management and of all men employed therein, who directed
   a millwright, employed for a month to make alterations in
   bleachers and working under his directions, and the altera-
   tions being completed and ready for testing, to assist him in the
   hazardous work of putting on a belt connecting the bleachers
   with the power, was a vice-principal, and not a fellow-servant
   of the millwright; and though the immediate work was extra
   hazardous and the field of operation was unreasonably unsafe

and the injury was due to the superintendent's own negligence in not using proper care to protect the millwright, the doctrine of fellow-servant does not bar a recovery.

3. ————: **Putting Belt on Pulley: Crippled Hand of Superintendent: Instruction to Disregard: Limiting Effect: New Trial.** Where the plaintiff was injured by the fact that the superintendent pushed a heavy belt onto a dead pulley while plaintiff's ladder was leaning against the shaft as he was endeavoring to "hand up the slack," without giving warning to plaintiff that the belt was about to begin to "crawl," whereby plaintiff was thrown to the floor, and the petition described the superintendent as "physically incapacitated to do such work," and plaintiff testified that he did not know the superintendent had a crippled hand, and the superintendent denied that its crippled condition interfered with his use of it, and plaintiff's instructions tendered no issue on the condition of that hand, it cannot be held that an instruction for defendant telling the jury that "there is no evidence in the case that the condition of the superintendent's left hand directly caused, or directly contributed to cause, the plaintiff's injuries, and your finding on that issue must be for defendant," merely limited the effect of the evidence, since it was so worded as to entirely destroy its effect. Nor, on the other hand, will 't be held, since neither on defendant's nor plaintiff's theory did the crippled hand connect itself in a causal way with the accident, that the giving of the instruction was a sufficient ground for granting plaintiff a new trial.

4. ————: ————: **Instruction: Diverting Jury's Minds From Issue.** An instruction should focus the minds of the jury on the real issues of the case, and not divert them therefrom. It should not lug in imaginary defenses unsupported by the evidence. Where plaintiff was assisting the superintendent of a mill to place a heavy belt upon a dead pulley, and both sides agree that it was the duty of the superintendent to give him notice when the belt began to "crawl" onto the pulley, and the vital issue is whether or not such notice was given, an instruction telling the jury that, though they may believe from the evidence that the superintendent "was negligent in the performance of the work in which he and plaintiff were engaged, and such negligence was the direct cause of plaintiff's injuries, yet if you further believe from the evidence that such negligence consisted solely in the superintendent's choice of the method of performing such work," you will find for defendant, is erroneous, since there was no evidence tending to show that "the choice of the method of performing such work" was the *only* negligence of the master.

5. ————: **Assumption of Risk: No Basis of Fact.** Where the vital question in the case is whether the master gave the

notice to the employee which it was his duty to give, and for failure to give which the injury resulted, there is no room in the case for an instruction on assumption of risks. Risks assumed by the servant are those which remain after the master has exercised ordinary care. And in this case it is held that the natural effect of such an instruction was to confuse and mislead the jury.

6. ————: **Due Care: High-Sounding Definition.** It is better that instructions use the words "due care" and then define what such care is, and not tell the jury that plaintiff "was bound to use his senses, intelligence and experience"—words calculated to lead astray the minds of common-sense jurors.

Appeal from Jackson Circuit Court.—*Hon. Edward E. Porterfield,* Judge.

AFFIRMED.

*Boyle & Howell, Edward J. White, E. R. Morrison, D. W. Johnson* and *Joseph S. Brooks* for appellant.

(1) Instruction number 2, given at request of appellant, was properly given. There was no evidence in the case tending to prove the converse. Sotebier v. Transit Co., 203 Mo. 721; Canaday v. United Railways Co., 130 Mo. App. 289; Peck v. Traction Co., 131 Mo. App. 141. Evidence having been admitted as to the fact it was proper for the court to limit its effect by instruction. (2) Instruction number 4, given at appellant's request, was properly given. It is hornbook law that the master has the right to choose the method of performing his work within the boundaries of reasonable care, and that the servant, in accepting the employment, impliedly agrees to perform his work his way, and cannot hold him for injuries resulting from dangers incidental to the work as he conducts it. Berning v. Medart, 56 Mo. App. 450; Mack v. Railroad, 123 Mo. App. 531; Coin v. Lounge Co., 222 Mo. 506; Steinhouser v. Spraul, 127 Mo. 562; Minnier v. Railroad, 167 Mo. 112; Chrismer v. Tel. Co., 194 Mo. 189; Alcorn v. Railroad, 108 Mo. 97; Brands v. Car

Co., 213 Mo. 709; Blundell v. Mfg. Co., 189 Mo. 558. (3) Instruction number 5, given at appellant's request, was properly given. It was in the form of the usual instruction on assumption of the risk as to form and has been approved by this court. It merely told the jury that the servant assumes the ordinary and natural risks incident to the service. Renfro v. Railroad, 86 Mo. 309. (4) Instruction number 7, given at appellant's request, is in proper form and enunciates a plain principle of law supported by many decisions in this State. Alcorn v. Railroad, 108 Mo. 97; Gibson v. Bridge Co., 112 Mo. App. 598; Watson v. Coal Co., 5 Mo. App. 366; Berning v. Medart, 56 Mo. App. 448.

*Shannon C. Douglass, Isaac N. Watson* and *Walter W. Calvin* for respondent.

The court committed error in giving, at the instance of the defendant, instructions 2, 4, 5, and 7. Therefore, no error was committed by the court in sustaining plaintiff's motion for a new trial, for the reasons assigned by the court, that it erred in giving certain instructions in the trial of this cause. (1) Whether or not the physical condition of Brown's hand was such, as shown by the testimony, as to directly contribute to cause him to allow the belt to slip over the face of the pulley, thus causing it to suddenly start, was clearly a question of fact, and should, therefore, have been submitted to the jury under an appropriate instruction. (2) Plaintiff by instruction number 4 was made to assume the negligence of the master, and the master, by becoming negligent in the selection of the method to be pursued in the performance of the work, was exonerated from liability for injuries consequent thereto. This instruction, then, becomes and is a plain statement of the old discarded doctrine of assumption of risk of the master's negligence. Blan-

ton v. Dold, 109 Mo. 64; Pauck v. Dressed Beef Co., 159 Mo. 467; Wendler v. People's, etc., Co., 165 Mo. 527; Curtis v. McNair, 173 Mo. 270; Charlton v. Railroad, 200 Mo. 413; George v. Railroad, 225 Mo. 364; Bien v. Transit Co., 108 Mo. App. 399; Strickland v. Woolworth & Co., 143 Mo. App. 528; Courtier v. Merc. Co., 146 Mo. App. 517; Gambino v. Coal & Coke Co., 164 S. W. 264. Instruction number 5 constituted error sufficient to sustain the action of the court in awarding a new trial of this cause, and is erroneous, for the following reasons: (a) There was no testimony upon which the same might be predicated; (b), all the testimony was to the effect that the usual way of putting on a belt was to put it on the dead pulley first, and then shift it upon the live pulley; (c), yet, by reason of the situation and construction of the shaft in question, and the location of the live pulley, the belt could not be adjusted in that manner; (d), it also assumes, and contrary to the testimony, that this belt was being placed over these pulleys in the usual and ordinary way. The giving of instruction number 7, also constituted error sufficient to warrant and sustain the ruling of the court, and is erroneous, for the reason that it does not correctly define the doctrine of contributory negligence. (a) It directed the jury to return a verdict in favor of the defendant, without regard as to whether or not the dangers attendant upon plaintiff's performing his task were so obviously apparent that a reasonably prudent man would not attempt the performance of the task. (b) It directed the jury to return a verdict for the defendant if he knew, or could have known, of any dangers, whatsoever, incident to the performance of the task, notwithstanding such dangers, if any, were the result of the negligence of the master. (c) It made plaintiff to assume the risk of being injured by his master's negligence, and, *arguendo*, told the jury that plaintiff could not recover, no matter to what extent the master had become negli-

gent. Jewell v. Bolt & Nut Co., 231 Mo. 176; Corby v. Telephone Co., 231 Mo. 417; Clark v. Railroad, 234 Mo. 396. It was unquestionably the duty of defendant to exercise reasonable care to avoid injuring plaintiff, and it therefore became the duty of its vice-principal, Brown, to warn or notify plaintiff of the danger to which he, plaintiff, was about to be subjected by the starting of the belt in question, and Brown's failure so to do constituted actionable negligence on the part of the defendant. Gayle v. Foundry Co., 177 Mo. 427; Koerner v. Car Co., 209 Mo. 141; Enloe v. Foundry Co., 240 Mo. 444; Butler v. Railroad, 155 Mo. App. 287; Ryan v. Railroad, 115 Fed. 197; Railroad v. Shaw, 116 Fed. 621. Even though the method by which Brown, the vice-principal, and Barker, the servant, were attempting to adjust the belt in question, was attendant with more dangers than were other methods which might reasonably have been employed, yet, on account of Brown's having chosen to adopt the former, and summoning plaintiff to assist him therein, it did not, and does not, lie in the defendant's mouth to assert that on account of its having chosen a more dangerous method for the performance of that task, and on account of plaintiff's assisting therein, he (plaintiff) should be denied a recovery. Hutchinson v. Safety Gate Co., 247 Mo. 116. And this principle applies, with the result that the defendant would still be held liable where the servant is injured through the negligence of the vice-principal, in consequence of a breach of some duty owing to such servant by the master, even though such vice-principal was, at said time, also temporarily acting in the capacity of a common laborer. Moore v. Railroad, 85 Mo. 588; Dayharsh v. Railroad, 103 Mo. 575; Bluedorn v. Railroad, 108 Mo. 448; Miller v. Railroad, 109 Mo. 350; Russ v. Railroad, 112 Mo. 45; Donahoe v. Kansas City, 136 Mo. 670; Bane v. Irwin, 172 Mo. 317; Fogarty v. Transfer Co., 180 Mo. 511; Schwyhart v. Barrett, 145 Mo.

App. 332; Taylor v. Railroad, 6 L. R. A. 586; Railroad Co. v. Skola, 183 Ill. 454; Norton v. Nadobak, 190 Ill. 599.

LAMM, J.—In a case sounding in tort in the Jackson Circuit Court, wherein the damages were laid at $15,000, the jury found for defendant. Thereat, on motion, the court ordered the verdict set aside, granting a new trial on the ground of error in defendant's given instructions. Thereat defendant, a corporation, appealed from such order. Plaintiff dying pending appeal, Strother, administrator, is substituted. For convenience we continue to use "plaintiff."

Defendant owned a flouring mill in Kansas City of a capacity of six hundred barrels daily. In this mill were devices known as bleachers, agitators, and conveyors operated by belts, pulleys, and shafting and run by steam power. These bleachers, etc., were devices to whiten the flour by the use of a current of air and electricity. One Brown was defendant's superintendent and in full control and management of the mill and all the men employed therein. About four weeks before the accident, plaintiff, a millwright, was employed by superintendent Brown to make some alterations in or put in some new bleachers. The bleachers or alterations were completed ready for testing, and while to that end plaintiff was assisting Brown in putting on a belt connecting the bleachers with the power he was thrown off a ladder and severely injured by the sudden and unexpected starting of the machinery. His suit for damages is bottomed on those injuries, and there is no question here as to their gravity.

It will not be necessary to set forth even a summary of the petition; for plaintiff's principal instruction was within its allegations and we reproduce that to show the pleaded grounds of negligence and the theory on which recovery was sought, viz.:

"The court instructs the jury that it was the duty of defendant to exercise ordinary care to furnish plaintiff a reasonably safe place in which to do his work, and to do no act of negligence, as defined by these instructions, which would render such place not reasonably safe for plaintiff to perform the usual and ordinary work required of him by defendant, while engaged in its performance, taking into consideration the kind and character of work to be done and the place in which it was to be done. If, therefore, you shall find and believe from the evidence that on or about the 20th day of August, 1904, plaintiff was in the employ of defendant as millwright, at its mill in Kansas City, Missouri; and if you shall further find and believe from the evidence that the defendant, at said time and place, had in its employ Patrick Brown as superintendent or head-miller at its said mill, and that said Brown had authority to hire and discharge plaintiff and direct him what to do and how to perform his duties in said mill; and if you shall further find and believe from the evidence that on or about the said date plaintiff was ordered and directed by said Brown, in his capacity as superintendent or head-miller as aforesaid, to get a ladder and go upon same, and thereby assist said Brown to put a belt upon the pulley mention in evidence; and if you shall further find from the evidence that, in obedience to said order, plaintiff did go upon said ladder, and while standing thereon it became reasonably necessary for plaintiff to occupy a stooping position for the purpose of raising the slack in said belt, and that he did occupy said stooping position on said ladder for the purposes aforesaid at and immediately before the happening of the injury complained of, and if you shall further find and believe from the evidence that while plaintiff was in such stooping position on said ladder for the purpose aforesaid, if you find he was in such position, defendant's superintendent or head-miller Patrick Brown, without

warning to plaintiff without plaintiff's knowledge of his intention so to do, negligently and suddenly threw the belt into position on said pulley to start said belt and pulley revolving; and if you shall further find and believe from the evidence that by reason of such act of suddenly throwing said belt upon said pulley and starting it to revolving as aforesaid, if you find he did so, the position or place in which plaintiff was working was rendered extra or unusually hazardous and not a reasonably safe place for plaintiff to work, and was not a usual and ordinary danger of such employment; and if you shall further find from the evidence that said Brown knew, or by the exercise of ordinary care on his part could have known, of the position in which plaintiff was situated immediately before and at the time of the putting on of said belt, and of the increased and unusual hazard, if any, of starting said belt and pulley while plaintiff was in such stooping position, if you find he was in such stooping position at said time, and that said Brown, under all the facts shown in evidence could, by the exercise of ordinary care on his part, have warned plaintiff that he was going to put said belt on said pulley in time to have permitted the plaintiff to have let go of said belt, if you find he had hold of the same; but said Brown failed to do so; and if you shall further find and believe from the evidence that at said time and place plaintiff was in the exercise of such care for his own safety as a reasonably prudent person would exercise under like or similar circumstances, and that as a direct result of said Brown's throwing said belt into position to start said belt and pulley revolving, without any warning to plaintiff, if you find that he did so without any warning to plaintiff, and that he thereby put the plaintiff in a position of increased and unusual danger or hazard as aforesaid, if any, and that as a direct result thereof plaintiff was thereby thrown from his position on said ladder to the floor of said mill and injured

thereby, as a direct result thereof, then your verdict must be for the plaintiff.''

Plaintiff introduced evidence tending to prove the facts hypothesized and outlined in that instruction and the averments of his petition. The case will proceed on appeal more understandingly by summarizing the tendency of plaintiff's proof, viz.: The bleachers, agitators, etc., were in an upper story of the mill. The shaft operating them was close to the ceiling of the story below. This shaft may be called the ''upper shaft.'' On this upper shaft was a pulley forty inches in diameter and ten inches wide, which, for the purposes of this case, we will call the ''dead pulley.'' The edges of this pulley were arranged so that the pulley had a rise towards the center, called a crown. In the room below this upper shaft close to the ceiling was another shaft directly connected by gearing and belts to the power. This shaft may be called the ''lower shaft.'' On this lower shaft was a pulley thirty inches in diameter and ten inches wide, which, for the purpose of this case, will be called the ''live'' or ''driving pulley.'' It revolved at the rate of 280 revolutions per minute. The live pulley was not directly under the dead one, but to one side so that when the belt connecting the two was on it stood at an angle of, say, forty-five degrees. Holes were made in the floor at the right places above the live pulley through which the endless belt passed. The alterations had been made in the bleaching devices or new ones installed by plaintiff and another millwright, Bennett, and the two had tested the machinery by an old light six-inch belt which was found insufficient. Thereupon, by direction of Brown, the two made a new heavy stiff eight-inch belt of two-ply leather, about seventy-five pounds in weight, and sixty-four feet long. They put it over the upper and lower shafts and made an endless belt of it by bevelling the ends (making tongue laps) and fastening them together with ''cement'' and by hammering

the tongue laps and leaving the cement to "set" until ready for use. Plaintiff, while experienced in putting on belts, had never put on one with Brown and was not familiar with his ways and methods. Brown's left hand was crippled and plaintiff did not know that fact. At a certain time Brown directed plaintiff to assist him in putting on the new belt that hung over the upper shaft hard by the dead pulley, and, as we understand it, also hung limp about the driving or live pulley on the lower shaft. The usual way of putting on such a belt is to first put it on the dead pulley and then on the live one, but in this case that plan was impossible because there was no room on either side of the live pulley for the belt to play in. Plaintiff knew that fact and knew the belt would be brought in contact with the live pulley first and while in such contact the edge of the belt above would be pressed or slipped on the dead pulley until by friction the power from below would be communicated through the driving pulley to the dead one. All sides agree that in putting on a belt in that way there comes an instant of time, as the belt is being shoved over toward the crown of the dead pulley, when it begins to bite or feed (one witness used the term "crawl on") and that such fact can be "felt" by the man pressing it on. When that precise time is reached, then, by pressure on the edge of the belt by a gloved hand, it goes on and the full power is at once communicated from the driving to the dead pulley. In order to put on a heavy belt like the one in question in said way and with ladders (as here) two men are necessary; one to put the belt on the dead pulley, and the other to lift the belt, or, as expressed by plaintiff, "to hand up the slack," in this instance several feet. When Brown directed plaintiff to assist in putting on the belt, plaintiff suggested that Bennett take part. We get the idea that plaintiff's proposition was that Bennett act instead of Brown and that plaintiff preferred to work with Ben-

nett because putting on a new, stiff and heavy belt in the way proposed was a ticklish operation attended with danger and it is better for the two men to have worked together till they think and act in accord. Brown did not take plaintiff's suggestion but directed plaintiff to assist him and plaintiff acquiesced. Brown was a man of experience in putting on belts and did a great deal of it as a part of his daily routine of duty as superintendent; sometimes with the assistance of others. The shaft carrying the dead pulley was so far from the floor that ladders were necessary to stand on. Two were at hand, to-wit, a long and a short one. Brown took the long ladder and left the short one for plaintiff. The significance of this was that Brown would be higher than plaintiff in putting on the belt and this in turn meant that Brown, having the farther reach up, would put the belt over the dead pulley and that plaintiff, from a lower position, would pull up the slack and hand it to Brown. That was the way it was done. According to plaintiff's evidence the upper end of Brown's ladder rested either on a joist or on the shaft to one side of the dead pulley. Plaintiff thinks it was the joist at the ceiling. The upper end of plaintiff's ladder rested against the shaft on the other side of the dead pulley. Defendant put in proof tending to show that plaintiff's ladder rested against a wheat bin, or ''stock hopper,'' a little to one side, but the divergence is immaterial. When Brown took his position on the long ladder to put on the belt, he was in a position to look down on plaintiff in position on the short ladder. On his part plaintiff would also look down but away from Brown. Standing on the narrow rung of the ladder, to lean over and lift so heavy and stiff a belt, it was necessary for plaintiff to brace himself against something, and he did brace himself against the pulley. In this condition plaintiff handed up slack once and Brown took it. Plaintiff then reached down to pull up more of the

slack, warning Brown at the time to be careful. All sides agree that it was customary and necessary for the man manipulating the belt on the pulley to give warning to the other man when the belt began to take hold or crawl, so that he might let loose or otherwise protect himself against its going on with the full force of the driving pulley. Plaintiff expected such warning but says he never received it. To the contrary, according to his testimony, when his face was toward the floor and he could not see Brown's hands or the position of the belt on the dead pulley, Brown put the belt on while plaintiff, so on the rung of the ladder, was in the very act of stooping over and pulling on it from below to assist him, and, the motion going on suddenly and without warning, he was thereby thrown violently to the floor and was gravely injured in having his hip fractured.

Brown, testifying for defendant, says he gave warning to plaintiff at the crucial instant, but at the same time says he did not know plaintiff had hold of the belt at that time or at any other time. As we gather it, his idea was that plaintiff was to use his hands in turning the dead pulley, not to hand up the slack. In other words, he, Brown, with his one hand was to lift the seventy-five pound stiff belt and put it on the pulley without plaintiff's touching it. To contradict the theory that he was expected to manipulate the pulley itself, plaintiff testified (and he had other testimony to the effect) that it would take five- or six-horse power to turn the dead pulley.

With the proof as outlined, defendant offered a demurrer at the close of plaintiff's evidence in chief and again asked a mandatory instruction at the close of the whole case, both of which were refused, and now on appeal its counsel argue not only that the questioned instructions were good, but that plaintiff and Brown were fellow-servants in and about the matter of put-

ting on the belt and therefore plaintiff made no case for the jury.

Plaintiff in turn complains of the giving of four instructions (two, four, five and seven) on behalf of defendant, all of which will appear in due course. His counsel argue that the motion for a new trial was well ruled because of error in those instructions; further that though the court did not specify other grounds in its order sustaining the motion, yet if there be other grounds for a new trial present then such other grounds sustain the order granting a new trial, and, on this head, his counsel invoke the doctrine that in granting a new trial there is a discretion in the trial court where the verdict is against the weight of the evidence. From that angle also they contend (that element being present and noticed in the motion for a new trial) the order granting a new trial was well enough. Such substantially is the case. Any other facts germane to a disposition of points ruled will appear further on in due order.

I.  *Of defendant's demurrer (and herein of the mandatory instruction).*

In their original brief counsel did not make the point that Brown and Barker were fellow-servants and hence the demurrer lay. It is made in their reply brief for the first time, and is there justified because plaintiff insists on sustaining the order granting a new trial, not only on the specifications made by the trial judge, but on other grounds as well. The appearance of the point is, therefore, late and somewhat by way of afterthought or counter thrust. Assuming, without deciding, that a defendant may appeal from an order granting a new trial and have the order reversed because plaintiff at the first trial did not make out a case (thereby taking away his chance of making one at the second trial) we proceed to dispose of the demurrer

and the mandatory instruction on their merits, apply-ing the theory that if plaintiff made no case he could not complain of the verdict, or of defendant's instruc-tions (Fritz v. Railroad, 243 Mo. 1. c. 69) and hence was not entitled to a new trial.

In our opinion the doctrine of fellow-servant does not bar recovery in this case as a matter of law. This because: There is no dispute on this record but that Brown was the superintendent of the mill and as such had exclusive supervision of its operations and of the men employed therein, including the two millwrights, Bennett and Barker. The whole case runs on the theory that Brown both in rank, capacity and act represented the master. To say that Brown and Barker were in a common employment is to say that the captain of a ship and a sailor are in common employment, because they are both, in a general sense, engaged in sailing the ship. The facts, then, make it a typical case of Super-intendent Brown being the vice-principal of the corpo-rate master. Unless his eye, voice, hand and acts were the master's then the master on this record was absent from that mill and neither acted *per se* or *per alium* there at any time. This general relation obtained, too, in the very act of putting on the belt. Brown, for the master, appointed the time, directed the method and assumed an attitude of a superior to a subordinate in the performance of that service. Let us copy a bit of the record on the point and from that discern the trend of the whole of it (Brown being on the stand):

"Q. Tell us what you said to him. A. Well, some-time before we put the belt on I was up on the floor he was working on, and I told him, I says, 'We will put the belt on, Mr. Barker.' Q. Speak up so that I can understand. A. I says, 'We will put the belt on when you get your work finished up, when you get that job completed.' He was connecting the power of the lower part of the agitator. Q. Didn't you mean by that a direction to come and assist you? A. I told him we

would put the belt on. Q. You were right there and had a right to direct him, didn't you?  . . .  A. *He was at work under my directions and instructions. . . .* Q. *He was there subject to your direction and instuction?* A. *Yes, sir.* Q. And you told him, you said you would put that belt on. Didn't you mean that as a direction to assist whenever you got ready to do so? A. It would mean that. Q. That was what you meant him to understand, wasn't it, when you said that? A. Yes, sir."

It would be unprofitable to reagitate the vexed question: Who is a fellow-servant? Or to reformulate or reannounce the doctrine of this court in that behalf. Error often lurks in generalities and no rule can be laid down that would fit all cases. It would be a bold judge who said that appellant courts had always been able to hold a steady and even voice in promulgating or applying general principles on this head. Cases may be found that approach the matter from this, that or the other angle (including that of "dual capacity") ; but no soundly reasoned case can be found, I think, where the master had a conceded vice-principal present, as here, and where such vice-principal personally by virtue of being master and in the line of his rank and duty took charge of a transaction and injured an employee negligently by exposing him to extra hazard, or by making his field of operations unreasonably unsafe, where the doctrine of fellow-servant was allowed to bar recovery. The reasoning and facts of many cases sustain that view of it. For example: Hollweg v. Telephone Co., 195 Mo. l. c. 156 et seq., and cases cited: Russ v. Railroad, 112 Mo. 45; Burkard v. Rope Co., 217 Mo. l. c. 480 et seq.; Bien v. Transit Co., 108 Mo. App. 399; Dayharsh v. Railroad, 103 Mo. l. c. 576 et seq.; Miller v. Railroad, 109 Mo. l. c. 356 et seq.; McIntyre v. Tebbetts, 257 Mo. 117. In the Miller case, supra, BLACK, J., summarizes the grounds of liability in this acceptable way:

Strother v. Milling Co.

"There is no doubt but a foreman or other representative of the master may occupy a dual position; that is to say, he may at the same time be a fellow-servant and an agent or representative of the master. There are certain duties which are personal to the master, and for the nonperformance of which he is liable to his servants. These duties may be delegated to a foreman or even to a servant, and the master is still liable for their nonperformance. Again, cases often arise where the master becomes liable by reason of the fact that he undertakes by himself or through a representative to do certain things which might have been left to the servant to perform."

The premises considered, defendant's demurrer and mandatory instruction were well ruled below.

II. *Of the given instructions for defendant alleged to be erroneous.*

Of the series of instructions given for defendant, plaintiff complains now of the second, fourth, fifth and seventh, and his counsel argue that the order granting a new trial may stand on the theory one and all were erroneous.

"2. The jury are instructed that there is no evidence in this case that the condition of Mr. Brown's left hand directly caused, or directly contributed to cause, the plaintiff's injuries (if any), and your finding on that issue must be for the defendant.

"4. Even if the jury believe from the evidence that the witness Brown was plaintiff's superior officer, and that said Brown was negligent in the performance of the work in which he and plaintiff were engaged at the time plaintiff claims to have been injured, and that such negligence was the direct cause of plaintiff's injuries (if any), yet if you further believe from the evidence that such negligence consisted

261Mo2

solely in Brown's choice of the method of place performing such work, and that plaintiff and defendant were, or by the exercise of ordinary care should have been, equally advised that such method was not reasonably safe (if it was not), and of all the risks and dangers (if any) incident to the performance of such work according to such method, then your verdict must be for the defendant.

. "5. The jury are instructed that the plaintiff in entering the employ of defendant and continuing to work for it, assumed the risks (if any) there were growing out of any danger there may have been in doing the work at which he was engaged in the usual and ordinary way. If therefore it appears from the evidence that the plaintiff's injuries (if any) were the result of such risk, then defendant is not in law at fault therefor, and it is your duty, without regard to the other questions in the case, to return a verdict in its favor.

"7. Plaintiff was bound to use his senses and intelligence and experience in and about the doing of his work, and if he failed to use either to the extent to which a person of ordinary care of his age and experience would have used them under the circumstances as they existed at the time he was injured, and if such failure directly contributed to cause his injuries (if any), then he is not entitled to recover in this case, and you must find for the defendant, and this is so even though you should find that the defendant was also negligent or failed in some duty it owed to plaintiff."

(a) To determine whether defendant's instruction number two was correct, attend to more of the record. The petition describes superintendent Brown as a man "who was physically incapacitated to do such work," meaning thereby the work of putting on such a belt in the way adopted. Evidently at least defendant's counsel had made reference in his opening statement to a crippled hand of Mr. Brown, and had ad-

vanced the theory that plaintiff knew all about it. We conclude so from the subjoined questions propounded to plaintiff when on the stand in chief and the answers thereto:

"Q. Now, you heard Mr. Boyle's statement here about Mr. Brown having a crippled hand? Did you know about that? State what the facts were in regard to that. A. That is a false statement; I didn't know it. I never knew he had a crippled hand until after the thing happened, because we had never done any work with him or been intimately associated with him. Q. Which hand was it that was crippled? A. I think it is his left hand."

Presently when one Remley was on the stand for plaintiff the latter's counsel sought to show that Brown had a crippled hand. Thereat defendant's counsel objected to the testimony because it "had no part or cut no figure in this accident . . . as shown by plaintiff's own testimony." On this objection plaintiff's counsel withdrew the challenged question. With the record in this fix, defendant's counsel, not content, later opened up the matter anew on their own hook. When Brown was on the stand one of them propounded questions and received answers as follows:

"Q. Is this hand impaired as to strength by reason of. the bent condition of these two fingers? A. No, sir, I have as much strength as I ever had in the right hand. Q. Did the condition of this hand in any way prevent you in doing the work of putting on that belt? . . . Q. Well, just describe to the jury in what way you used or did use this hand, if at all, and what, if anything, the condition of the hand interfered with or affected it? A. Well, I didn't use this hand at all. All I used this hand for was on the ladder to support myself on the ladder, hold the ladder. I put the belt on—raised the belt with my right hand."

When plaintiff came to his instructions, he tendered no issue whatever on the condition of Brown's

left hand and made no reference to the physical incapacity mentioned in his petition.

The real question, then, is: In the light of the whole record was it error to give instruction number two for defendant?

To support the instruction defendant's counsel argue after this fashion: "It would appear from the record that the issue was not before the court, but evidence being admitted tending to show that the witness Brown had a crippled hand it was proper for the court to limit its effect by instruction." But it will be observed that the instruction does not *limit* the effect of the evidence. *Contra,* it is so worded as to entirely *destroy* its effect. Presently we will set forth facts from which we can get at Brown's theory of how the accident happened, but for present purposes it is sufficient to say that neither in his nor in plaintiff's theory did the crippled left hand of the superintendent connect itself in a causal way with the accident. We conclude, then, that although defendant must stand sponsor equally with plaintiff for lugging Brown's crippled hand into the case, and though the court, without committing error, might have left the evidence stand as a circumstance for what it was worth in connection with all the other facts and circumstances, yet we cannot see that the merits of plaintiff's case were materially affected by the instruction, even as broad as it is. Hence if there was no other error at the trial, the order granting a new one could not well stand on such a narrow and precarious point.

(b) In disposing of the fourth instruction, attend further to the record. Defendant's principal witness, its only reliance, was Superintendent Brown. As already indicated, there is substantial agreement between him and plaintiff on the necessity of notice to the helper at the precise time the principal actor "feels" the belt beginning to crawl or bite on the dead pulley. Now, plaintiff says he received no such notice, though

he was depending on it. Brown seems to admit the need of it and the right of dependence on it. He acquits himself by saying he gave it in this form, "Look out," and received the response from plaintiff, "All right," or "Let her go." As in the very old and quaint doctrine noticed by Abbott and borrowed from Roccus (Abb. on Shipping, *371): "If the mice eat the cargo and thereby occasion no small injury to the merchant, the master must make good the loss, because he is guilty of a fault; yet if he had cats on board his ship he shall be excused"—so here, this master stands on notice for his excuse. Notice is the cat that eats the mouse, negligence. It would be to read this whole record with inattention not to see that the the sharp turning point, the vital issue, in the case, rests on the timely giving of that notice. If the jury believed Brown on that issue, then plaintiff's case falls to the ground. If the jury believed plaintiff, then a clear case of negligence was made out on the part of the master whose *alter ego* Brown was; and so, in effect, the case was put to the jury in plaintiff's chief (and only general) instruction hereinbefore set forth. The ladders used by Brown and plaintiff had iron spikes below, but nothing to fasten them above. As said, Brown's leaned against the shaft or a ceiling joist, and plaintiff's leaned against the shaft or a "stock hopper." Mr. Brown says, in substance, that the belt was stiff and required strong pressure to put it on the dead pulley, and that while giving such pressure and after the "look out" notice, his ladder thereby was caused to slip away from the pulley and so far up-set that he jumped to the floor. As we read the record there is no causal connection between the shoving over of the upper end of Brown's ladder and the accident to plaintiff. The inference to be drawn from Brown's version is that his pressure on the belt shoved his own ladder over, and that the notice he gave to plaintiff was timely and sufficient to put him on his guard. In this condition of things de-

fendant asked and received instruction number four. It told the jury to find for defendant although the master was negligent and although such negligence was the direct cause of the injuries, provided the jury found further that the master's negligence consisted "solely" in Brown's choice "of the method of place [*sic*] performing such work," and also found that both the master and plaintiff were, or by the exercise of ordinary care should have been, equally advised that such method was not reasonably safe, and equally advised of "all the risks and dangers (if any) incident to the performance of such work according to such method." That instruction was not the law of this case. It is wholly unsupported by the evidence. There was none tending to show that the choice "of the method of place performing such work " (whatever that may mean) was the *only* negligence of the master. The broad and accepted current of the proof on both sides is directly to the contrary. The negligence of the master, if any, was in the failure to give notice at the crucial moment that the belt was going on. The method of performing the work called for that notice. The instruction eliminates that idea, and, while it is not clear precisely what it does mean, yet it is plain enough that it directs the jury's attention to a feigned or false issue and away from the place or issue where the shoe actually pinched. The quail uses that device to protect its young brood when surprised by an intruder. One Alcibiades used it. I remember to have read in an idle hour (*i. e.,* before I came on this bench) that he had a very fine dog with a beautiful tail, costing (that is, the dog did) a thousand dollars or so. This dog was a favorite in Athens (say B. C. 420) and its tail (proudly carried) was much admired by the versatile and artistic citizens of that town. Having cut off his dog's tail, and being brought to book therefor (for all I know before the dicasts at the judgment-seat) Alcibiades justified himself by saying he cut it off so that the

Athenians would talk of that and say nothing worse of him. But the foregoing plan of obscuring the issue by putting forward something else to talk about is no working theory in the administration of justice. The precept is: The law is always more praised when it is consonant with reason. Plaintiff was gravely injured and, if his story be true, had a meritorious case. He was entitled to have the jury's mind focused on, not diverted from, the issues. Instruction number four did not fill that office, for that its tendency was to litter up the mind of the jury with a feigned issue. If the premises announce sound doctrine, as we think they do, then the order granting a new trial stands safely on the theory that instruction number four was erroneous.

(c) And this brings us to defendant's instruction number five on assumption of risk. Assumption of risk has been defined by a discriminating writer as "a term or condition in a contract of employment, either express or implied from the circumstances of the employment, by which the employee agrees that dangers of injury ordinarily or obviously incident to the discharge of his duty in the particular employment shall be at his own risk." [Bl. L. Dict.] The words "or obviously" connect themselves logically with the doctrine of *volenti non fit injuria,* and are broad enough to cover the idea (among others) of known dangers voluntarily encountered. In this jurisdiction it seems that to settle liability for encountering dangers arising from the master's negligence that are so glaring and imminent an ordinary prudent person would not encounter them, reference is had to the doctrine of contributory negligence (sounding in tort) and not to the assumption of risk (sounding in contract); for in this jurisdiction it has become settled doctrine that the servant does not assume the risk of his master's negligence. [George v. Railroad, 225 Mo. l. c. 408 et seq.] The Missouri doctrine is that there is another term

express or implied in the contract of employment between master and servant, to-wit, that the master will exercise care to protect his servant by (among other ways) providing him a reasonably safe place to work; and that when the assumption of risk on the part of the servant and the aforesaid assumption on the part of the master are allowed to proceed hand in hand, as they should in holding the scales of justice true, it results that the risks assumed by the servant are those which remain after the master has exercised ordinary care. [Charlton v. Railroad, 200 Mo. l. c. 433; Curtis v. McNair, 173 Mo. 270.] Assumption of risk and contributory negligence are two doctrines that so overlap and intermingle on certain phases that in some jurisdictions the obvious or known-danger-voluntarily-encountered theory is put under the head of assumption of risk. A great jurist, Chief Justice LEMUEL SHAW, first announced the doctrine of assumption of risk in this country in 1842 in the Supreme Court of Massachusetts in the celebrated case of Farwell v. Boston, etc., R. R. Co., 4 Metc. 49. [2 Bailey, Pers. Inj. (2 Ed.), sec. 353; 1 White, Pers. Inj., p. 417, note 3.] In defining it he does not seem to include the element of known danger voluntarily encountered as Black does, but puts the matter in this guarded way:

"The general rule. resulting from considerations as well of justice as of policy, is, that he who engages in the employment of another for the performance of specified duties and services, for compensation, takes upon himself the natural and ordinary risks and perils incident to the performance of such services, and in legal presumption, the compensation is adjudged accordingly."

But philosophizing about the matter at this day is unprofitable. This court has a doctrine, as said, to-wit, that the master cannot impliedly or expressly contract against his own negligence, hence the servant does not assume the risk of the master's negligence;

and that doctrine must supply the test or touchstone for the instruction in hand. [See cases supra; Hutchinson v. Richmond Safety Gate Co., 247 Mo. 71; Chambers v. Chester, 172 Mo. 461.]

In instruction number five the doctrine of assumption of risk is put to the jury as an abstraction of law. Broadly interpreted, it is likely its form would pass muster as an abstraction, although critically speaking it puts the cart before the horse, it makes the injuries result from the risk instead of from the danger ordinarily incident to the discharge of duty in the given employment. But that is by the by, for there is a deeper-going objection to it, to-wit, it had no place in the case under the facts of the record. The case hinging on the giving of timely notice by the master to the servant, what have the dangers, ordinarily incident to that form of employment or to the appliances they used, to do with the case? *Is a failure to give notice* (the presiding fact in the case) an *ordinary* incident the risk of which the servant assumed? Would not the jury so interpret such rule falling from the lips of the judge and decisive of the whole case, as this one is? If so, then the servant assumes the risk of the master's negligence in a situation sprung suddenly and imperiously demanding the instant use of care and caution. Much of what is said in considering instruction number four is applicable here. The natural result of that instruction was to confuse and mislead the jury, hence the order for a new trial may stand on the error of giving it.

(d) Speaking to defendant's instruction number seven, we say this: Plaintiff in his own quoted instruction put to the jury the issue of his due care. In that view of it, we need not seek for any real ground upon which to put the issue of contributory negligence to the jury as an affirmative defense, for by invoking the judgment of the jury on his due care he thereby invoked their judgment on his lack of it and that, in turn, spells

contributory negligence. But we do not approve the form of that instruction. We eye it askance as a daring and anxious novelty that disturbs more than it benefits. It would have been better to have said that plaintiff was required to use due care in doing his work and then gone on and defined, in the accepted language of the law what due care was, instead of using the formidable words: "was bound to use his *senses and intelligence and experience.*" What does that sweeping and sounding aggregation of words mean, even to a lawyer or judge? They swell by contemplation and broaden by analysis. What did the plain men in the box understand, either taken in the aggregate or severally, by them? They smack much of argument by overpressing the matter; and in trying to assign a meaning to such all-embracing terms as "senses," "intelligence," "experience" might not the jury be led astray, and their native hue of common-sense (the immediate jewel of an ordinary juryman's mind) become "sicklied o'er with the pale cast of thought," or lost in a fog? We fear so—nay, we think so. Those words do not form part and parcel of the mild, simple and colorless definition of due care the law delights in. The beaten way is the best way and the safe way.

The conclusions reached make it unnecessary to consider the question sprung by plaintiff, to-wit, that the order granting a new trial was within the discretionary power of the court relating to granting one when the verdict is against the weight of the evidence. In the face of another trial we prefer not to comment on that feature.

It follows from what has been said that the judgment should be affirmed and the cause remanded for the new trial granted below. Let it be so ordered. All concur.