## STATE ex rel. WM. F. DUVALL v. JAMES ELLISON et al., Judges of Kansas City Court of Appeals.

### In Banc, July 12, 1920.

**NEGLIGENCE: Fellow-servant: Irregular Foreman: Dynamite Explosion: Conflict of Opinions.** The owner of a large tract of land had employed twelve or more men to remove stumps therefrom, among them a boy sixteen years old. The manner of removal was to bore holes in the stumps, and to place a stick of dynamite in the hole, in which was inserted a detonating cap attached to a fuse, which being ignited exploded the cap, and it in turn exploded the dynamite. The work was in charge of a general manager, but in his absence one Blough directed the work, and on a cold December morning Blough told the boy, who had been employed in the work for several weeks, to go to the stump patch, get his auger, warm it and go to work. Other men had preceded the boy and built a fire, and the boy took his auger there to warm it, and all the other employees were told by Blough to bring their augers to the fire and warm them. Blough ordered boxes of dynamite to be brought to the place, sat down upon an unopened box, ordered one of the men to cut the fuses into four-foot lengths, and began to prime the caps and to insert the fuses thus capped into the sticks of dynamite taken from the open boxes near by. The priming was done by slipping a cap over the end of a fuse, then crimping the open end with steel pliers, which was a dangerous process, especially if done in close proximity to the dynamite, since if the percussion cap was crimped too near its closed end it would explode and in exploding would cause the dynamite to explode. When Blough, only a few feet from the fire, crimped a cap with the pliers, there was an explosion, which killed him and three other men, and blew off the leg of the boy, who was standing on the opposite side of the fire, warming his auger. *Held*, that Blough was not a fellow-servant with the boy, but was at the time entrusted with his master's power of directing the men and of controlling their movements in the very acts which resulted in the boy's injury; and the court could not declare, as a matter of law, that the master was not liable for his

State ex rel. Duvall v. Ellison.

injuries, but the question was one for the jury; and the opinion of the Court of Appeals so holding does not conflict with McIntyre v. Tebbets, 257 Mo. 117.

## *Certiorari.*

WRIT QUASHED.

*W. O. Jackson* and *D. C. Chastain* for relator.

(1) One who is a foreman and authorized to direct the work of a servant who is injured is a fellow servant as to acts not involving the exercise of his authority as foreman, and in doing an act which is the work of a co-laborer with the injured servant, negligently, thereby causing the injury, does not render the master liable. McIntyre v. Tebbetts, 257 Mo. 157; Fogarty v. St. Louis Transfer Co., 180 Mo. 490; Stephens v. Lumber Co., 110 Mo. App. 405. (2) The work in which plaintiff's son and others and Blough, the alleged "straw boss," were engaged was the clearing of stumps from a tract of ground by boring holes under stumps, preparing dynamite shots to be placed in these holes, placing and discharging the dynamite by which the stumps were blown out, in which the persons thus engaged were fellow-servants. Relyea v. Ry., 112 Mo. 86; Hawk v. McLead L. Co., 166 Mo. 128; Strottman v. Ry. Co., 211 Mo. 227; Stocks v. Transit Co., 106 Mo. App. 129; Henson v. Pascola Stave Co., 151 Mo. App. 234; Livengood v. Lead & Zinc Co., 179 Mo. 229. (3) Under a well-established rule in this State, it is not necessary, in order that two persons be fellow-servants, that they be engaged in the same kind of work, but they are fellow-servants if they are engaged in the general enterprise in which they are all engaged. Murray v. Ry. Co., 98 Mo. 573; Higgins v. Mo. Pac. Ry., 104 Mo. 419; Schaub v. Ry. Co., 106 Mo. 74.

*Swearingen & Finnell, Volney McFadden* and *W. H. Hallett* for respondents.

(1) The decision of the Kansas City Court of Appeals is not in conflict with any decision of this court. (a) The trial court erred in sustaining the demurrer to the evidence at the close of plaintiff's case and in directing a verdict for defendant. In determining whether the record discloses substantial evidence to prove the cause of action, the court is required to make every inference of fact in favor of the party offering the evidence which the jury might in any degree of propriety have inferred in his favor, and is not at liberty to make inferences of fact in favor of the defendant to countervail or overthrow either presumptions of law or inferences of fact in favor of the plaintiff, as that would be usurping the province of the jury. Clark v. Long, 196 S. W. 409; Trebbe v. American Steel Foundries, 185 S. W. 179; Behncke v. Clay Mining Co., 189 Mo. App. 639; Campbell v. Ry. Co., 175 Mo. 161; Hollweg v. Bell Tel. Co., 195 Mo. 149. (b) A demurrer to plaintiff's evidence concedes the truth of such evidence. Moloney v. United Rys., 183 Mo. App. 292. (c) In determining whether or not a verdict should be directed for defendant, plaintiff's evidence should be viewed in the light most favorable to him. Moore v. United Rys. Co., 185 Mo. App. 184; Dorrity v. Railroad, 188 Mo. App. 365; Kennish v. Sanford & Ray, 193 Mo. App. 368; Pfeiffer v. Supreme Tribe, 191 Mo. App. 38. (d) The duty of the master to use ordinary care to furnish his servant a reasonably safe place to work is a primary duty; one that he cannot delegate to any servant so as to escape liability for a negligent exercise thereof. Combs v. Cons. Co., 205 Mo. 367; Clark v. Foundries Co., 234 Mo. 436; Clark v. Long, 196 S. W. 409; Dayharsh v. Ry. Co., 103 Mo. 570; Miller v. Mo. Pac. Ry., 109 Mo. 357; White v. Montgomery Ward & Co., 191 Mo App. 268; Hollweg v. Bell Tel. Co., 195 Mo. 149; Jewell v. Sturges, 245 Mo. 720; Donohue v. Kansas City, 136

Mo. 670; Herdler v. Buck Stove Co., 136 Mo. 16; Stobile v. McMahon, 190 S. W. 652; Koerner v. St. Louis Car Co., 209 Mo. 141; Hahn v. Mo. Pac. Ry. Co., 92 Mo. 440. (e) It is the personal duty of the master to direct and control the work, and if one of his servants is given power and authority to direct and control other servants in a performance of some branch of the master's work, the latter is liable for negligence on the part of such superior servant in the exercise of the power and authority thus conferred upon him. Jorkiewicz v. Brake Co., 186 Mo. App. 539; Burkard v. Rope Co., 217 Mo. 466; Strother v. Milling Co., 261 Mo. 1; Dowling v. Allen, 74 Mo. 13; Gale v. Mill Co., 159 Mo. App. 639; White v. Montgomery Ward, 191 Mo. App. 271. (f) In cases of negligence, liability does not hinge on whether, by the exercise of reasonable prudence, the very injury complained of ought to have been foreseen. The party charged may be liable for anything which, after the injury is complete, appears to have been a natural and probable consequence of his act or omission. Corby v. Tel. Co., 231 Mo. 417; Buckner v. Stock Yards Co., 221 Mo. 700; Benton v. St. Louis, 248 Mo. 98; Zimmerman v. Pryor, 190 S. W. 26. (g) A foreman having under him laborers bound to obey his orders, is, as to them, a vice-principal to their employer, and not their fellow-servant, and this although another may be general foreman of the entire establishment, with authority over him. Dowling v. Allen & Co., 74 Mo. 13; Combs v. Cons. Co., 205 Mo. 367; Stobile v. McMahon, 190 S. W. 652; Bane v. Irwin, 172 Mo. 306; Mertz v. Rope Co., 174 Mo. App. 107; Jorkiewicz v. Brake Co., 186 Mo. App. 534. (h) A "straw-boss," or one acting in the place of the regular foreman at the request of the latter, represents the master in directing and controlling the work. Barrett v. M., K. & T. Ry. Co., 138 Mo. App. 135; Mertz v. Rope Co., 174 Mo. App. 94; Gale v. Mill Co., 159 Mo. App. 639; Warren v. Railroad, 113 Mo. App. 498; Bien v. Transit Co., 108 Mo. App. 399. The decision of the Kansas City Court of Appeals is in harmony with

the ruling decisions of this court.    Batesel v. American Zinc Co., 207 S. W. 742.

WALKER, C. J.—*Certiorari* to the Kansas City Court of Appeals to quash its record in Gibbs v. Duvall, 201 S. W. 605, alleged to contravene our ruling in McIntyre v. Tebbetts, 257 Mo. 117.   In the original case the plaintiff, Lydia Gibbs, a widow, sued the defendant Duvall for the loss of services of her minor son and for expenses incident thereto on account of personal injuries inflicted upon him through the alleged negligence of the defendant.   At the close of plaintiff's direct presentation of the case the trial court sustained a demurrer to the evidence.   Upon an appeal to the Kansas City Court of Appeals the lower court's ruling was reversed and the case remanded for a new trial.

The facts as found by the Court of Appeals are that Duvall, the defendant in the original suit, owned a large tract of land near the town of Butler.   Twelve or more laborers had been employed by him to remove stumps from the land with which much of it was covered.   Plaintiff Gibbs's son, a boy 16 years of age, was one of these employees. . The work was in charge of a general manager named Howard.   The manner of the removal of the stumps was by boring auger holes in them, placing in each a stick of dynamite, in which was inserted a detonating cap attached to a fuse.   By igniting the latter the dynamite was exploded and the stump blown out of the ground.   The plaintiff's son had been employed in this work for several weeks before the accident which resulted in his injury.   One Bert Blough, who, in the absence of Howard, directed the work, told the Gibbs boy early on the morning of December 20th, to go down to the stump patch and get his auger, warm it up and go to work.   In obedience to the order the boy went to the field where he and the men had been removing stumps the day before and got his auger.   The weather was cold, below freezing, and it was necessary to warm the augers to prevent them from breaking before commencing work.   Some of the men had pre-

ceded the boy to the field and had built a fire. He took his auger there to warm it. A few moments after he began to warm the auger, some boxes of dynamite and fuse and caps were brought and placed near the fire. All of the employees present were told by Blough to bring their augers to the fire and warm them. They obeyed. Blough, who can be said to have ordered the dynamite brought to the place where the boy was warming his auger, then sat down upon an unopened case of dynamite and, directing one of the men to cut the fuse into four-foot lengths, began the work of priming each fuse with a cap and inserting the fuses thus capped into the sticks of dynamite taken from the open cases near by. The work thus being done was in dangerous proximity to a quantity of fuse and dynamite and was near the fire where the men were warming the augers. When a fuse had been capped and attached to a stick Blough laid it on the ground at his side. Although there was a supply of caps at his feet, as a further demonstration of Blough's general supervision he sent one of the hands for an additional supply. It was not yet daylight and the only light Blough had for the priming operation was that from the fire and perhaps a lantern which he seems to have had.

The caps were like the old percussion caps formerly used upon muzzle-loading guns, except that they were of the diameter of an ordinary lead pencil and were about an inch and a half in length. The closed end, like the old percussion caps, had therein a small quantity of a high explosive which, when set off by the burning of the fuse, exploded the stick of dynamite into which the cap end of the fuse had been inserted. The cap was fastened to the fuse by slipping it over the same, or putting the end of the fuse inside of the cap and against the closed end, and then with a pair of pliers crimping or compressing the open end of the cap to the fuse so as to hold it in place. To avoid accident it was necessary that care be exercised to crimp the cap as close as possible to its open end, or to apply the pressure as far away from the detonating end as possible. An ex-

pert testified that this process of priming and fusing dynamite was the most dangerous part of the work connected with its use; and in putting these caps on the fuses, the proper, reasonable and safe method was to do so at a distance from the dynamite, since if a cap exploded it would not only set off a quantity of other caps, but also the dynamite. While Blough was thus employed the plaintiff's son, in company with four of the men, were standing about the fire warming their augers preparatory to going to work. Blough, while engaged as stated and only a few feet away from the fire, was talking to the man standing at his side. While thus occupied he crimped a cap with his steel pliers and there was a blinding flash and a tremendous explosion which killed Blough, his companion and three of the men who were warming their augers. One of plaintiff's son's legs was blown off, blood issued from his mouth and ears, and he received other serious injuries.

The foregoing embodies the material facts as disclosed in the opinion of the Court of Appeals. Much of it is in its nature historical and it is relevant only so far as it tends to throw light upon the court's conclusion as to the status of Blough and the consequent liability of the defendant Duvall and hence the right of the relator to this writ.

A comparison and contrast of the facts in McIntyre v. Tebbetts, supra, with those in the case at bar, are necessary to a determination of the matter at issue. In the McIntyre-Tebbetts case one Kuhr, the driver of a wagon used by a manufacturing company in hauling freight from its factory to railway stations for shipment, was authorized to employ and did employ the men needed to load and unload the wagons thus used by his employer. He had control of the men while thus employed and furnished them with statements as to their hours of labor upon which their compensation for same was estimated and paid. On the day of the accident he hired the plaintiff to assist in loading and unloading the wagon which he, Kuhr, was driving. After

State ex rel. Duvall v. Ellison.

it was loaded and they were *en route* to the railway station, Kuhr driving and the plaintiff McIntyre riding on the load, the former directed the latter to return an iron bar which they had inadvertently taken with them and deliver it to the shipping clerk at the office of their employer, and that he, Kuhr, would wait until the plaintiff's return.   When the latter returned he attempted to climb upon the wagon where he had previously been riding and was expected to ride, and just as he placed his foot upon the hub of one of the front wheels Kuhr started the team suddenly and plaintiff was thrown to the ground and injured.   In a suit brought by him against Tebbetts, the employer, to recover damages for the injuries thus inflicted, there was a judgment in the circuit court in plaintiff's favor, which upon an appeal to this court was reversed, a majority of the court holding that while Kuhr was the vice-principal of the defendant in the hiring of the plaintiff and in controlling his work while loading and unloading the wagon, at the immediate time of the accident Kuhr, as a driver of the wagon, was the fellow-servant of the plaintiff and that the latter was not entitled to recover.   Three members of the court thought otherwise and their reasons therefor will be found in their dissenting opinion.   A repetition of same is not necessary here.   Conceding, as we must, although the reasons adduced in the majority opinion still appear to us to be tenuous, the binding force of the conclusion held to follow from the facts in that case, if sufficiently parallel with those in the case at bar, will justify a like conclusion here.   But are they parallel or even so akin that the conclusion in the one case may reasonably be held to establish a precedent for the determination of the other?   In the McIntyre-Tebbetts case, however, variant may have been the opinions as to the correctness of the conclusion reached therein, this much must be conceded, that the plainly defined authority of Kuhr as a vice-principal of his employer as to his relation to persons employed by him was tech-

nically limited to the loading and unloading of the wagons, and the majority opinion so held.

There was no such limitation as to the status of Blough in the instant case. "Whenever Howard, the manager, was not around, whatever Bert Blough said went." The morning of the injury plaintiff's son heard Howard 'tell Blough to put him and several other men to work boring holes, and Blough did so. Every man who testified said they received their orders and directions from Blough. When the men wanted directions as to what to do, they went to Blough and he generally told them what to do. He directed the work and superintended it, told the men "what to do, and what kind of work to do, and where to work." They received orders and instructions from him and obeyed them; and there is evidence tending to show that this was with the knowledge, sanction and authority of the defendant himself, and not merely the unauthorized act of Howard in placing Blough over the men. Frequently, when the men were in the field at work, with Blough in charge of and directing them, the defendant would come out and watch them, and would consult with Blough and obtain information and say what he had to say through him.

The conclusions of the Court of Appeals, couched in its own language, clearly define the rule of law to be deduced from these facts:

"Certainly a jury could readily say that Blough was a foreman by authority of the defendant, and not merely by authority of Howard alone. Blough had superintending oversight of the employees on the ranch, including plaintiff's son. . . . He was intrusted at the time with the master's power of control of the practical business done in the field and of directing the movements of said son and of the other employees there. He is certainly not to be conclusively regarded as a fellow-servant of the others, nor is that question to be decided by the name his position is called, nor by whether he could or could not hire and discharge the

men under him.    [Dayharsh v. Hannibal & St. Joseph R. Co., 103 Mo. 570, 575.]    . . .

"If a servant is given authority to direct and control other servants in the performance of some branch of the master's work, he is not a fellow-servant of the others, but is a vice-principal. [Burkard v. Leschen & Sons Rope Co., 217 Mo. 466, 117 S. W. 35; Strother v. Kansas City Milling Co., 261 Mo. 1, 169 S. W. 43; Gale v. Helmbacher, 159 Mo. App. 639, 140 S. W. 77; White v. Montgomery Ward & Co., 191 Mo. App. 268, 271, 177 S. W. 1089; Jorkiewicz v. American Brake Co., 186 Mo. App. 534, 539, 172 S. W. 441.] And this is true, even though another may be general manager of the entire place, with authority over the foreman. [Dowling v. Allen, 74 Mo. App. 13, 41 Am. Rep. 298.] A 'straw boss,' or one acting in the place of a foreman, represents the master in controlling and directing the work. [Barrett v. Mo., Kan. & Tex. Railroad Co., 138 Mo. App. 135, 119 S. W. 980; Mertz v. Leschen & Sons Rope Co., 174 Mo. App. 94, 156 S. W. 807.] Clearly, the court could not, as a matter of law, say that Blough was a fellow-servant, for that question, under the circumstances, was one for the jury to pass upon under proper instructions. [Fogarty v. St. Louis Transfer Co., 180 Mo. 490, 514, 79 S. W. 664, 1 Ann. Cas. 136; Gale v. Helmbacher Mill Co., 159 Mo. App. 639, 140 S. W. 77.]

"It is true that a person may be a vice-principal of his master and also a fellow-servant of the one injured, and if the negligent act arises merely through the doing of the labor the two are performing in common, and not as a result of the exercise of authority over the co-laborer, then the negligence is that of a fellow-servant. It is the character of the act, and not alone the servant's rank, that determines the question of liability or non-liability. For this reason, defendant contends that Blough's negligence arose out of the work he was doing as a fellow-servant, and not as a foreman. It may be questioned whether this is true, even as applied to the act of negligence in the one specific feature of the handling and use of the dynamite—i. e., the fusing and

crimping of the cap too close to the detonating end. For, while the preparation of the fuse and caps, or, in other words, the priming of the dynamite, may in one sense be deemed a detail of the general work to be accomplished, yet since it is of such a hazardous nature, and one that must be performed in an isolated place and away from the proximity to others, and involves the preparation of a dangerous instrumentality, it would seem to be a detail of such importance and of such a character as to be chargeable to the duty of the master.

"It is manifest that, so far as concerned the work in which plaintiff's son was engaged, the dynamite used in blowing out the stumps was not a completed instrumentality until it had been properly primed and capped, and that this was of an exceedingly dangerous character, not to be done in the presence of others. If this be so, then Blough, in preparing the instrumentality, was not acting as a fellow-servant, but as the representative of his master. . . . But, however this may be, when we come to the other negligence attributable to Blough, in the handling of the dynamite and the priming and capping of it so close to other persons and to quantities of caps and dynamite—all of which was shown to be negligent and dangerous—and when we consider, also, the negligence in failing to warn plaintiff's young and inexperienced son of the dangers incident to the priming and capping of dynamite, we see that none of such negligent acts arose by reason of the performance of labor in common with plaintiff's son, but grew directly out of a negligent performance of Blough's duties as foreman. So that, in justifying a demurrer to the evidence, no help can be derived by defendant from the principle of dual capacity applicable to a servant like Blough.

"There is, however, another view of the case, which, if sound, renders the defendant liable, if the facts are believed by the jury, without regard to whether Blough was a fellow-servant or not; and that has to do with

the charge of negligence in failing to furnish plaintiff's son with a reasonably safe place in which to work or in failing to keep it reasonably safe. Such a duty is a primary duty, which is non-delegable. [Combs v. Round Tree Const. Co., 205 Mo. 367, 104 S. W. 77; Dayharsh v. Hannibal & St. Jos. R. Co., 103 Mo. 570; . . . Miller v. Missouri Pacific R. Co., 109 Mo. 350, 357; . . . White v. Montgomery Ward & Co., 191 Mo. App. 268, 177 S. W. 1089; Hollweg v. Bell Tel. Co., 195 Mo. 149; . . . Herdler v. Buck's Stove & Range Co., 136 Mo. 3, 16, 37 S. W. 115; Koerner v. St. Louis Car Co., 209 Mo. 141. . . .]

"Defendant seeks to avoid this ground of liability on the theory that the place where the boy was assigned to work was elsewhere than at the fire where the explosion occurred. His contention is that the boy's place of work was at the stumps and that the fire was some 200 yards from where they were. We have carefully searched the record, but have been unable to find anything showing how far the stumps were from the fire. But, assuming that they were that far away, or were where some other men seem to have been at work that distance away, still plaintiff's son was not away from his working place when at the fire warming his auger. The whole affair, stumps and fire, were in the field and close enough together to constitute the place of work, when Blough told the boy to go down there to the stump patch, get his auger and warm it and go to work. The boy, in obedience to that command, went down to the field, and found two men had preceded him and had built a fire. He had not been there the Saturday before, and did not know the precise spot at which the men had stopped work, nor did he know where the augers were. He said that, when he was told to go down there and get an auger, he supposed the other men knew where the augers were. . . . Plaintiff's son did not disobey instructions, but obeyed them. He went down to the field where the work was to be done, and found a fire there, and in a moment one of the hands, at Blough's

direction, brought the augers to the fire and the boy proceeded to warm his as directed.

"While there is no one who expressly states that Blough directed the dynamite to be brought to the fire, yet the inference may well be drawn that it was brought there at his direction, since he came to the fire, apparently knowing it was there, began the work of preparing it for use, and ordered other caps to be brought; and . . . everything that was done that morning was under his command and direction. The jury, therefore, could find that Blough also directed the bringing of the dynamite to the fire. And he began the work of preparing the instrumentality for use—i. e., the work of priming and capping it there, with the boy and his companions standing near, warming their augers, as they had been told to do. Certainly the boy could not be said to be away from his place of work, so as to absolve his master from the duty of maintaining it in a reasonably safe condition, or at least of not allowing or making it to become unduly dangerous. In the circumstances here considered, the place the master is required to keep reasonably safe, or at least not to render unduly dangerous, cannot be restricted to the very spot occupied by the stumps under which the boy was expected to bore after he had warmed his auger. It also included the spot where the fire was, and the two were so near to each other and so connected together as to form all one and the same place, and to make the master's duty apply. [Clark v. Union Iron & Foundry Co., 234 Mo. 436, 452.] . . .

"Nor can it be said that, since the blasting of stumps by means of dynamite is a dangerous work, therefore no liability can be predicated upon the master's failure to keep the place as reasonably safe as the circumstances would permit. True, the blowing up of the stumps may be said to be dangerous work, but not especially so to plaintiff's son, who bored holes under a stump before the dangerous agency was applied. But the evidence is that it was extremely hazardous to cap

and prime fuses near to dynamite, or to do such work when near others. Blough ordered the dynamite brought to the place where the boy was warming his auger, and he there began the exceedingly dangerous work of capping the fuses and attaching the dynamite in dangerous proximity to a quantity of fuse, of dynamite, and also near the men. The direct result of this was to render the boy's place of work unduly dangerous, a great deal more so than was usual or necessary in the careful and ordinary prosecution of the work.

"Nor can liability for the negligence in failing to warn plaintiff's young and inexperienced son of the dangers incident to the handling and priming of dynamite be defeated on the ground that the boy knew the explosive power of dynamite, and was therefore guilty of contributory negligence in remaining at the fire and close to where the dangerous work of priming it was going on. He knew that dynamite was a powerful explosive, it is true; but he did not know that the work of attaching caps to the fuses and of priming the dynamite was dangerous. The boy was placed in an exposed and dangerous situation, with no warning whatever as to the peculiar danger arising from what was there being done. This was negligence, and the boy's mere knowledge that dynamite was an explosive cannot relieve from liability. [Dowling v. Allen, 74 Mo. 13, 41 Am. Rep. 298; Bulson v. International Shoe Co., 191 Mo. App. 128, 177 S. W. 1084; Timmerman v. Frankel, 172 Mo. App. 174, 157 S. W. 1051; Zimmerman v. Pryor, 190 S. W. 26.] . . . At any rate, the question of whether his knowledge of the danger was so complete as to make him guilty of contributory negligence would be for the jury to pass upon and not for the court.

. . .

"Neither can it be said, as a matter of law, that it was a physical impossibility for plaintiff's son to see Blough crimping the caps, because the boy said that Blough was south and a little bit east of the fire, while

he was northwest thereof; nor that it was a physical impossibility to see the crimping process, without looking or seeing across the fire. The case should have been submitted to the jury on some of the charges of negligence, at least, and it was error to sustain a demurrer to the evidence.''

From the foregoing comprehensive statement of the facts upon which the court's legal conclusions were based, the difference between this case and that of McIntyre v. Tebbetts, is clearly marked, and while the line of demarcation as made in the majority opinion in that case may be sustained on the technical ground that when McIntyre was hurt he was not at that moment in the performance of duties which were subject to the direction of Kuhr, the evidence, fairly construed, warrants no such distinction in the case at bar. The only limitation upon the authority of Blough in superintending and directing the work in which the men were engaged was the presence of Howard. ''Whenever Howard was away whatever Bert Blough said went.'' Howard was away. The evidence, therefore, as stated by the Court of Appeals, convinces us that its opinion does not contravene the ruling in the McIntyre-Tebbetts case or in any other rendered by this court having facts sufficiently parallel to authorize its being cited as a precedent.

From all of which we are of the opinion that our writ herein was improvidently issued and should be quashed. It is so ordered. *Williamson, Goode, Williams* and *Blair, JJ.,* concur; *Graves, J.,* dissents; *Woodson, J.,* absent.