ALBERT H. MARKLEY, RESPONDENT, v. KANSAS CITY, MISSOURI, APPELLANT.*

Kansas City Court of Appeals. July 8, 1926.

*Corpus Juris-Cyc References: Appeal and Error, 4CJ, p. 764, n. 80; Damages, 17CJ, p. 1079, n. 46; Master and Servant, 39CJ, p. 1132, n. 35: p. 1194, n. 35; p. 1220, n. 71; New Trial, 29Cyc, p. 883, n. 87; p. 886, n. 5; p. 1009, n. 54; Trial, 38Cyc, p. 1502, n. 54; p. 1548, n. 24.

*Arthur W. Edwards* and *John F. Cell* for respondent.

*John T. Barker* and *Marcy K. Brown, Jr.* for appellant.

ARNOLD, J.—This is a suit in damages for personal injury alleged to have been received through the negligence of defendant while plaintiff was in the employ of defendant as a common laborer.

The injury for which plaintiff seeks damages is alleged to have occurred on May 22, 1923, while plaintiff was working for defendant

as a laborer on a drilling rig, engaged in drilling certain holes in the terrain in the vicinity of Monroe street and the Missouri Pacific Railway Company's tracks in Kansas City, Mo., for the purpose of ascertaining the nature of the strata of earth to be passed through in tunnelling under the Missouri River preliminary to the construction of the new waterworks system for defendant city.

For use in drilling operations there was constructed a tripod about eighty feet in height consisting of three telegraph poles lashed together at the top and bolted. At this point there was attached a swivel, or pulley, through which a cable operated running direct to a windlass. The drill operated beneath this swivel or pulley, using a washing device operated by hydraulic pressure. The pulley and cable were used in raising and lowering the casing or pipe three inches in diameter used in the process. This casing was driven down by machinery. There was also a core pipe about one and one-half inches in diameter in the center of the outer casing. The driving of the casing is accomplished by use of a hammer in forcing it down. It appears that on top of this core pipe it is necessary to use an I-bolt screwed to the top valve, so that as the hammer worked up and down thereon by means of the rope cable which operated through the swivel, or pulley, above mentioned, the I-bolt furnished a means by which the hammer could be stayed. To make it more effective and easier to guide, a crowbar or pinch bar was inserted in the I-bolt, which served the purpose of raising or lowering the core pipe by attaching the cable thereto.

It appears there were two platforms built in the tripod by nailing 2 x 4's around the outside of the telegraph poles by which the same were constructed. One of these platforms was ten feet from the ground and the other twenty. Upon each platform were laid two loose planks about 10 x 12 feet in length which served as a landing when changing the pipes or hose, and in taking and putting on hose for washing. The crew operating the drill rig consisted of three men, viz., plaintiff, Morris Fennessey and Alfred Copeland, foreman. On the morning of the accident, Copeland and plaintiff were on the first platform and Copeland put the pinch bar through the I-bolt, plaintiff driving it in. It appears that Copeland then went down from the platform and started the engine which operated the rig while plaintiff remanded on the platform to watch the bar while the machinery was operating, to keep it from falling out, and to prop it whenever it worked loose. Copeland was not satisfied with the way the pipe was going and said to Markley, (plaintiff), "I am going to take that casing off before it is cross-threaded." The accident which followed shortly thereafter is thus described in plaintiff's testimony:

"'So Mr. Copeland came upon the platform again and taken ahold of the end of the bar while I drove it out. So he held the bar

so when I drive it out it wouldn't fall down and hurt somebody. He taken the bar. I taken the hammer and drove it out. So when— he had the bar in his hand, I swung myself down on the windlass of the engine and stepped down on the engine and went down and got hold of the chain tongs and started work on there and the last I saw of Mr. Copeland he was on the —standing on this board with the bar in his hand trying to step over to the landing. . . . So I was down there working and someone came up behind me, I presumed it was Mr. Copeland because it sounded like his voice. He said—I never turned around—he said "Markley how is it coming?" I said, "It is coming easy now"—and all at once everything went dark to me and someone said, "Look out!" and everything went dark.'

"Just before we come down off of the platform, I drove the bar out and he (Copeland) had hold of the bar . . . he had hold of the bar in his hands, holding it up there. I don't know what was done with it or nothing.

"Q. How did he come down? A. I never seen him come down.

"Q. Now Mr. Markley, did you know what struck you on the head? A. No, sir, I didn't know at the time. I did not know until some of the boys, after I was—"

It appears that no part of the drill rig was in operation at the time of the accident. Plaintiff testified that in removing the pinch bar from the I-bolt, Copeland caught hold of the big end of the bar and plaintiff, with a hammer, drove it out of the I-bolt, at which time Copeland said to plaintiff: "Markley, get down and take this casing." Plaintiff did as directed and he and Fennessey set about the task of removing the upper section of the casing; that he, plaintiff, was taking it off with a wrench, and Fennessey was steadying the pipe. It appears that after the pinch bar had been removed from the I-bolt, it was left upon the platform, or on one of the planks thereof.

Frank Miller, a witness for plaintiff, stated he saw the accident and observed the circumstances just prior thereto; that he saw Copeland and plaintiff on the platform; that Copeland came down therefrom before plaintiff and that Copeland either brought the sledge hammer down or threw it down, and that plaintiff followed Copeland from the platform. Describing the manner in which plaintiff received his injury, witness stated:

"Mr. Markley and Mr. Fennessey, another worker working there, and Mr. Copeland and I standing about eight feet from where they were working unscrewing the pipe with a set of tongs and as they went to lift it, the top end of it leaned over and came in contact with this bar releasing that from the platform, and the small end

of it started coming down, to fall, and I yelled to 'Look out,' and I made a grab for this bar, but I missed and the bar came down and struck Mr. Markley on the head.

"Q. And who was it had—who left the bar up there? Do you know who left it or.how it was left there, the bar that rolled off and struck Mr. Markley? A. Mr. Markley left the bar up there. . . .

"Q. And it was being removed. And who was doing that? That is, who was engaged in the immediate work of lifting that pipe away? A. Mr. Markley and Mr. Fennessey."

This witness also testified that in removing the pinch bar Copeland wielded the hammer.

Morris Fennessey testified on behalf of defendant as follows:

"We were putting casing down and the casing, we did not get started the .thread, the thread got cross-threaded and we had to get —two of them went up to break a chain. Mr. Copeland and Mr. Markley went up on the first scaffold, went up there and one of them —they had a bar and sledge at the time and they were taking it off or fixing it up, to get it fixed where we could use it, and they got through up there, Mr. Copeland came down first and Mr. Markley came down after him and we went to work again on this casing and this bar was up there, left up there on the scaffold, and we went to work and the end of this pipe hit the bar.

"Q. The upper end of the pipe? A. Yes, sir; the upper end of the pipe hit this bar and it fell down."

Alfred Copeland the foreman testified that he did not leave the pinch bar on the platform; that after he descended from the platform he did not notice that the pinch bar had been left there; that after plaintiff descended from the platform he and Fennessey were engaged in screwing on another pipe which was "cross-threaded or something," and then "when it came off the pipe kind of fell over and hit the boards up there and this bar fell down."

The testimony shows that when the bar fell it struck plaintiff on the head with terrific force and violence, producing serious, danger-ous and permanent injuries. The petition alleges that these injuries produced concussion of the brain, fracture of the bones of the head, neck and skull; that the tendons, ligaments, tissues and nerves were torn, strained, bruised and contused; also producing cerebral hem-orrhage; all the muscles, tissues, ligaments, bony substances, cartilages and other organs and nerves of plaintiff's eyes and ears were badly torn, strained, sprained, bruised and contused, and that plaintiff's eyes and ears ceased to function normally; his eyesight and hearing have been greatly impaired and destroyed; that plaintiff's neck, spine and spinal column were twisted and injured; that plaintiff sustained numerous bruises all over the body and his intestinal organs were in-

jured and misplaced; that thereby he loses and will continue to lose his natural rest and sleep; that he has dizzy and fainting spells, nausea and high temperature, and that plaintiff has suffered three or four strokes of paralysis in his side and limbs; that plaintiff has incurred and expended for surgical and medical attention the sum of $2000, and for hospital bills $500, and for drugs $200, and for nurse hire $500; that plaintiff has lost and will lose valuable time from his employment and his earning capacity has been lessened, impaired and almost destroyed; that all the said injuries are permanent, progressive and lasting in character. Judgment is asked in the sum of $5000.

The negligence charged in the petition is that defendant failed to furnish plaintiff a reasonably safe place in which to work and reasonably safe tools or appliances with which to work, and that defendant, its servants, agents and employees, and its vice principal and foreman, failed to exercise reasonable care and were negligent, first, in the construction and operation of the structure, tripod, platforms and drilling rig, in that the telegraph poles composing the tripod were not placed in equal distance from the hole that was being sunk, and were not sunk in the ground a sufficient distance and were not securely lashed together at the top, thereby increasing the danger of materials, articles and tools falling therefrom; second, the boards and planks comprising the platforms were weak, light and insecurely fastened to said tripod; third, that the board or planks making up the platforms were not firmly joined together, but were largely separated, thus increasing the hazard from falling articles; fourth, that defendant's vice principal and foreman negligently ordered plaintiff to work in the said place of danger.

The answer was a general denial. The cause was tried to a jury, resulting in a verdict for plaintiff in the sum of $3000, and judgment therefor was accordingly entered. A motion for a new trial was ineffectual and defendant appeals.

Appellant urges, first, that its demurrer offered at the close of plaintiff's evidence should have been sustained, on the ground that there is no showing that defendant nor any of its servants was guilty of any negligence which caused, or contributed to plaintiff's injury. In our consideration of this question it is our duty to give plaintiff's evidence every reasonable intendment favorable to his cause of action and if there is any substantial evidence of record to support a verdict, the trial court may not be convicted of error in submitting the issues to the jury.

It is not disputed that Copeland was foreman and had charge of the crew of workmen of which plaintiff was a member at the time of the occurrence in question. There is evidence that Copeland, as foreman, ordered plaintiff to descend from the platform; that plaintiff

did so descend, and, at the time of the injury, was engaged with another laborer in taking off a threaded casing, when the pinch bar which some one had left on the platform above was dislodged and fell upon plaintiff's head. Some point is attempted to be made by defendant to the effect that if the pinch bar was left on the platform by plaintiff himself, he is not entitled to recover. We need not rule on this point here for the reason that the testimony is conflicting. Plaintiff testified that Copeland left the pinch bar there and if the point is material it was a question for the jury, although Copeland contradicts plaintiff on this point. Furthermore, the evidence shows, and this is not disputed, that there were but two loose boards forming the platform upon which the pinch bar was left; and the manner of construction of the platform is charged as negligence in the petition.

Defendant also attempts to make a point of the fact that Copeland and plaintiff, being engaged in removing the pinch bar from the I-bolt, were therefore fellow servants and defendant may not be held liable. As above stated, it is not disputed that Copeland was in the employ of defendant and, that he was in charge of the small group of men operating the drill rig; neither is it disputed that at the time of his injury plaintiff was engaged in a task under the direction of Copeland. A situation similar to the one in the case at bar is found in McCall v. Dry Goods Co., 236 S. W. 324, where the Supreme Court said:

"The case of McIntyre v. Tebbetts, 257 Mo. 117, 165 S. W. 757, is cited and relied upon by the respondent to sustain an action of the trial court. Before passing to the consideration of that case it is well to notice the general doctrines recognized in that case as well as in others. Where an injury to an employee occurs through the negligence of the master, combined with that of fellow servant, the master is liable for the injury thus sustained. [Citing cases.] And this rule is applicable where an employee is injured by the negligent act of a fellow servant when acting in the capacity of vice principal. [Comisky v. Urbauer-Atwood Heating Co. (App.), 219 S. W. l. c. 1000; State ex rel. v. Ellison, 283 Mo. 532, 223 S. W. 651.] This arises from what is called the dual capacity doctrine, well recognized in this State—the doctrine that a fellow servant may act in that capacity and at the same time act in the capacity of vice principal. [Citing cases.]"

In the case of McIntyre v. Tebbetts, cited in the McCall case, it is held that it is the act which causes the injury and not the rank of the vice principal which determines whether the employees are fellow servants. [State ex rel. v. Ellison, 283 Mo. 532, 223 S. W. 651; Strother v. Milling Co., 261 Mo. 1, 169 S. W. 443.] In the Strother case it is said in the unique language of Judge LAMM:

"It would be unprofitable to reagitate the vexed question: Who is a fellow servant? Or to reformulate or reannounce the doctrine of this court in that behalf. Error often lurks in generalities and no rule can be laid down that would fit all cases. It would be a bold judge who said that appellate courts had always been able to hold a steady and even voice in promulgating or applying general principles on this head. Cases may be found that approach the matter from this, that or the other angle (including that of 'dual capacity') but no soundly reasoned case can be found, I think, where the master had a conceded vice principal present, as here, and where such vice principal personally by virtue of being master and in the line of his rank and duty took charge of a transaction and injured an employee negligently by exposing him to extra hazard, or by making his field of operations unreasonably unsafe, where the doctrine of fellow servant was allowed to bar recovery. The reasoning and facts of many cases sustain that view of it."

We think plaintiff's evidence is such that by reasonable inference the jury could find that it was through the negligence of defendant by its vice principal, Copeland, in creating an unsafe place in which plaintiff was required to work, which was the producing cause of the injury. There was no error in the action of the trial court in overruling the demurrer offered at the close of plaintiff's evidence and again at the close of all the evidence.

Touching defendant's argument that the court erred in refusing its instruction in the nature of a demurrer at the close of all the evidence for the reason that plaintiff's injury was caused by the act of a fellow servant, or, by the combined act of a fellow servant and the negligence of plaintiff, we may say: As to the part of this charge of error in respect to the act of a fellow servant, we have already disposed of this point; and the point of plaintiff's contributory negligence clearly was a question for the jury.

It is charged the court erred in overruling the motion for a new trial on the ground of newly-discovered evidence. [Sec. 1453, R. S. 1919.] The granting of a new trial is within the sound discretion of the trial court. [Farrell v. Transit Co., 103 Mo. App. 454; Rodan v. Transit Co., 207 Mo. 393; Gould v. St. John, 207 Mo. 619.] The court has no authority to order a new trial on the ground of oversight. The newly-discovered evidence is indicated in four affidavits which are to the effect that plaintiff had been employed after his alleged injury. Plaintiff testified that he had not been able to perform any work from the date of his injury until the trial of the case. Defendant quotes plaintiff's testimony on this point as follows:

"Q. Mr. Markley, since May the 22d, 1923, have you been able to work? A. I haven't done no work at all.

"Q. Have you been able to work? A. No, sir. If I had I would because I have got a wife and two babies to make a living for."

An examination of the record discloses that the answer of plaintiff was excluded by the court on objection of defendant. The affidavits presented disclose that plaintiff, in fact, was employed at guard duty part of the time after his alleged injury, and that he also was engaged in some political work in the matter of convassing voters. Had plaintiff's testimony on this point been admitted in evidence, the affidavits presented could have had no other effect than to have contradicted plaintiff.

It has been held that diligence is a prime condition precedent to granting a new trial on the ground of newly-discovered evidence. [Devoy v. Transit Co., 192 Mo. 197.] The affidavits show on their face that three of the four affiants were in the employ of defendant city, and it would seem that due diligence was lacking in discovering this evidence prior to the trial herein. We are unwilling to disturb the verdict and judgment for this reason. It is in evidence that immediately after the accident plaintiff was taken to the emergency hospital at the city hall; and there his head was dressed by a nurse; that plaintiff then went to the office of Fred McGuire, secretary to the chief engineer, who gave plaintiff an order to Dr. C. E. Wilson, official physician for the fire and water board. Plaintiff immediately called on Dr. Wilson and was treated by him. Thereafter plaintiff was treated at his home by Dr. Wilson and plaintiff's family physician, and later, at the direction of Dr. Wilson, he was taken to St. Joseph Hospital.

It is urged the court erred in refusing to grant a new trial on the ground of prejudicial and improper remarks of plaintiff's counsel in his closing argument, directed to the failure of defendant to produce Dr. Wilson as a witness, based upon the following occurrence:.

Mr. Cell, counsel for plaintiff, stated:

"You observed that Dr. C. E. Wilson, the first physician who examined him, was sworn also at the time Dr. Marty was sworn.

"Mr. Lee (counsel for defendant): I object to that argument as improper.

"Mr. Cell: Then I will withdraw it.

"The Court: Sustained. I stated to counsel no reference should be made to it, before you started your argument, under the circumstances. Proceed.

"Mr. Lee: I ask on account of the argument made, the jury will be discharged.

"The Court: Overruled at this time."

It is urged that this argument was calculated to prejudice the jury in plaintiff's favor and was extremely harmful, in view of the fact that Dr. Wilson was referred to in the testimony as being in the em-

ploy of defendant city; and for the further reason that plaintiff's attorney "in a spectacular manner" called Dr. Wilson inside the court rail and had him sworn in the presence of the jury, only a short time before the objectionable argument was made. It will be noted that counsel for plaintiff withdrew the remark, and the court overruled defendant's motion to dismiss the jury. Under these circumstances, we are not willing to say the remarks complained of were fatally prejudicial. Defendant's citations are found not to be contrary to this ruling.

It is charged plaintiff's instruction No. 1 is erroneous in, that it purports to cover the whole case and directs a verdict, and does not require the jury to find that either the construction of the tripod or the platform thereon was done in a negligent or improper manner, nor that the negligent construction of either or both was the proximate cause of plaintiff's injury. It is urged that the instruction, as worded, permitted a finding for plaintiff merely on the finding that the construction engineer, or the foreman of defendant, constructed said tripod and platform without requiring a finding that they were negligently constructed.

The instruction complained of is long and for the purposes of this review, it is not necessary to reproduce it here, but on examination, it is found to be not open to the criticism urged against it. The instruction requires a finding that the tripod and platform constructed thereon was made up of loose planks, not connected and joined together, "but separated and lying loose on the supports of said platform, leaving holes and gaps through which tools might fall," etc. It requires a finding that Alfred Copeland was defendant's foreman in charge of the work; that while said platform was in said condition, said foreman placed, allowed or permitted to be placed on said platform the pinch bar or crowbar mentioned in the evidence, and while so placed, and while plaintiff was on the ground beneath said platform, in the employ of defendant and about his work in said employment and in the exercise of ordinary care for his own safety, that plaintiff was struck by said crowbar falling from said platform and thereby injured; that such act of said foreman was negligence and that said foreman failed to exercise that care which an ordinarily careful and prudent person would have exercised under the same or similar circumstances; and that the said failure was the direct cause of plaintiff's injuries, then they should find for plaintiff.

Clearly this instruction fully and fairly submits the actionable negligence charged in the petition. [Strother v. Milling Co., 261 Mo. 1, 16, 169 S. W. 43, 47; Wuelner v. Mill Co., 259 S. W. 764, et seq.]

It is further insisted that plaintiff's instruction No. 1 is erroneous because it does not require the jury to find that Copeland's negligence either in placing, allowing or permitting, the pinch bar or

crowbar to be and remain on the platform was the proximate cause of the injury. The instruction itself refutes this charge, in the following language:

"And if you further find that said acts of said foreman, Alfred Copeland, in placing, allowing or permitting the crowbar to be on said platform, if you find he did so, and that said act of said foreman, if you find he did such act, was negligence, that it to say, that said foreman failed to exercise that care which an ordinarily careful and prudent person would have exercised under the same or similar circumstances, if you find he did so fail, and that said failure, if any, was the direct cause of plaintiff's injuries, if any, then you will find for the plaintiff." [DeMoss v. Rys. Co., 296 Mo. 526, 246 S. W. 566, and cases therein cited.]

Finally, it is charged that plaintiff's instruction No. 2 is erroneous because it allowed the jury to find as much as $2200 on account of medical service, medicine and doctor's bills, while the testimony shows plaintiff was not entitled to more than $855. Plaintiff testified that the amount of doctor's bills and other expenses incident thereto which had been incurred by him was "about $3000" and on cross-examination he stated he was "out $1000." There was testimony in plaintiff's behalf giving in detail the amount of expenditures and obligations incurred in connection with the injury and treatment therefor to the amount of $855. There was no testimony in plaintiff's behalf further than his own statement as above. He made no attempt to show the actual amount he had expended, or for which he was obligated, other than we have just stated, and his testimony was nothing more than a guess, and a guess is not substantial evidence.

We think plaintiff's instruction No. 2 was erroneous in view of this testimony and that the finding, as shown by the evidence, was $1200 in excess of the amount plaintiff was entitled to recover for expenditure and obligations incurred for treatment, drugs and surgical supplies. If, therefore, within ten days from the filing of his opinion, plaintiff will remit the sum of $1200 from the amount of the verdict, the judgment will be affirmed; otherwise it will be reversed and the cause remanded for a new trial. *Bland, J.,* concurs; *Trimble, P. J.,* absent.