HERMAN P. THOMAS, Appellant, v. AMERICAN SASH & DOOR COMPANY.—14 S. W. (2d) 1.

Court en Banc, February 11, 1929.

*J. C. Stanton, C. R. Leslie* and *Hogsett & Boyle* for appellant.

*A. L. Berger* and *Morrison, Nugent, Wylder & Berger* for respondent; *Homer H. Berger, H. L. Hassler* and *Delos C. Johns* of counsel.

WALKER, J.—This case comes to me upon reassignment after a rehearing in the Court en Banc. It is an action for personal injuries brought by a servant against a master. The trial court sustained a demurrer to the evidence, and after the usual procedure the plaintiff appealed.

The defendant operated a plant for the manufacture of woodwork in Kansas City. In this plant there are a number of rip-saws, operated by belting and pulleys. Plaintiff was a laborer employed by defendant to operate one of these saws. His right arm was torn off by the starting of the saw, through the alleged negligence of one Nick Barnickel, another employee, who prematurely turned on the power and started the saw without warning while the plaintiff was in the act of oiling the same as a part of his necessary duties in complying with the orders of the general foreman and of Barnickel. The negligence of the latter was conceded by the defendant when the case was heard in Division One of this court as is disclosed by the record.

The saw in question was known as number 1 rip-saw. It was about two feet from the east wall of the work-room. The saw was on a steel table, about four feet square and three feet high. Power was transmitted to the saw by belting and pulleys from an overhead shaft. The saw itself, that is the cutting disk, was circular in shape and operated in a slot in the surface of the steel table, and was set in motion or stopped by throwing a near-by lever extending down from the ceiling. The saw was attached to a steel shaft which ran east and west under the surface of the table, through three bearings. These bearings had to be oiled. In order to oil two of them it was necessary to reach through the belting on the east side of the saw. At such times the saw would be stopped and the belting would be motionless. It was plaintiff's duty to do this oiling, a duty necessary to the efficient operation of all machinery. He had been ordered to do it twice a day, once upon beginning work in the morning and again upon the commencement of work after the noon hour.

The injury occurred just after the 12:40 o'clock whistle had blown following the noon hour, while plaintiff was in the act of oiling the bearings of the saw. Plaintiff had raised the table top of his saw in the usual way, and had oiled the west one of the three main bearings. He then went around to the east side of the table and extended his right hand through the belting to reach the center bearing with the oil can. In order to oil the center bearing it was necessary to reach through the belting. Plaintiff was performing this task in the ordinary manner in which he usually did it and as other rip-saw operators did it. His arm, while he was thus engaged, was in a position of perfect safety so long as the saw was stationary, but in a position of the gravest danger if it was set in motion. While plaintiff was thus situated and within the sight of Barnickel, the latter pulled the starting lever and set the machinery in motion without warning and tore off plaintiff's right arm.

I. The concession of Barnickel's negligence by the defendant is an inescapable conclusion, based upon the facts. Barnickel, whose relation to the plaintiff was that of a vice-principal, as we will presently discuss, had given the plaintiff a general order to oil the main bearings of the saw at 12:40 o'clock each day. The injury occurred within a few minutes of 12:40 o'clock. Barnickel knew, or he must be held to have known that at the time he turned on the power and started the saw in motion that the plaintiff, in the proper discharge of his duties, would be oiling the machine. Barnickel, at the time of the injury was standing within five or six feet of the plaintiff. It was midday or, as the witnesses put it, "broad daylight." There were no obstructions between Barnickel and the plaintiff while the latter was oiling the saw, to prevent the former from seeing the plaintiff and realizing his danger from turning on the power. As a minor incident, confirmatory of Barnickel's knowledge of the situation or his opportunity for obtaining such knowledge, it appears that the table top of the saw was turned up. This circumstance carried with it notice to Barnickel that the plaintiff was oiling the saw in compliance with the orders of the appellant. Possessed of this knowledge Barnickel's act in turning on the power and starting the saw cannot be construed as other than negligence.

Other facts disclosed by the testimony might be stated to sustain this conclusion but, such is the probative force of those set forth that the statement of others is not deemed necessary.

II. The remaining question, a proper determination of which will settle this controversy, is whether Barnickel's negligence was that of a vice-principal or of a fellow servant. Barnickel was the

operator of a cut-off saw, which was located about eight feet north of the rip-saw, operated by the plaintiff. About six weeks before the injury, the plaintiff was assigned by the general foreman, named Kimes, to work on the rip-saw. The circumstances under which this assignment was made are thus testified to in effect by the plaintiff: "He" (Kimes) "took me over to number 1 cut-off saw," where Barnickel worked, "and said to Nick" (Barnickel), " 'Here's a ripper for you. Show him what you want him to do;' then he said to me, 'You will get your orders from Nick.' " A literal transcription of plaintiff's further testimony concerning the character of Barnickel's relation to him is as follows:

"Q. Now, did you get any orders at that time from Nick Barnickel, any general orders about the work? A. Well, he just told me about oiling the saw right to start with.

"Q. He said to oil the saw twice a day? A. He said to oil the saw twice a day, oil the whole saw of a morning just after seven o'clock, and just after the whistle blew at twelve-forty to oil the main bearings of the saw."

"THE COURT: Now, who told you this? A. Nick Barnickel, the cut-off sawyer.

"Q. Now, Mr. Thomas, did you get many other orders from Nick Barnickel during the progress of your work as an employee there on number 1 rip-saw? A. Yes, I got all my orders for the work.

"Q. Well, tell what they were. A. He would tell me of the size and kinds of ripping done, what he wanted, and also told me the quantity, and he would direct me as to piling the lumber, sometimes tell me about rush orders, to hurry up and rush this and rush that, that he wanted it right away, and he would frequently send me away from the saw, for me to go to some other part of the plant or something, or do some work, and he would operate my saw while I was gone.

"Q. Was there ever anything about the quality of the lumber? A. Well, yes, he would pass on the quality of it, after I ripped. I would rip the lumber, as he asked it, would come up to him and he would pass on it. If it was satisfactory it would go on through, if it wasn't he would send it back to me and tell me to get out another one.

"Q. Did you give him any orders? A. No, I had no occasion to.

"Q. Did you always obey his orders? A. Certainly.

"Q. Did you get orders from anybody else? A. No, I got all my orders from Nick."

Other witnesses who were at the time employees of the defendant in the same department as the plaintiff, corroborated his testimony as to Barnickel's authority, conferred by the defendant and exercised by him, over said employees.

The theory upon which this case was brought, as disclosed by the petition, is that Barnickel was a vice-principal and as such invested

with authority to direct the manner and order the performance of plaintiff's work. The testimony demonstrates the correctness of this theory and sustains the conclusion that the status of Barnickel was that of a vice-principal.

The contention as to the dual capacity of Barnickel in that he was for certain purposes a vice-principal and for others a fellow-servant, if true, does not militate against the correctness of the conclusion, under the facts, that so far as his relation to the plaintiff was concerned he was a vice-principal. Barnickel, pursuant to the authority conferred upon him by the defendant, not only regulated but ordered the manner in which the plaintiff was to perform his work. These orders, necessary to the performance of effective work, extended even to the time and manner in which plaintiff was to oil the bearings of the saw before operating the same. This, as Judge RAGLAND says in Dreessen v. Natl. Bldg. Material Co., 319 Mo. 1010, 5 S. W. (2d) 1, constituted him a vice-principal; or as was said by the St. Louis Court of Appeals in Daggett v. American Car & Fndry. Co., 284 S. W. 1. c. 856, "Where a servant is given authority to direct and control other servants in a branch of the master's business, he is not a fellow-servant with the others, but is a vice-principal for whose negligent act the master must respond." [Citing many cases.]

The recent case of Doody v. California Woolen Mills Co., 216 S. W. (Mo.) 531, reviews the question as to what constitutes a vice-principal under facts similar to those in the case at bar, and holds that an employee giving orders to another under the authority of the master was not a fellow-servant but a vice-principal.

To a like effect is the case of Burkard v. Leschen & Sons Rope Co., 217 Mo. 1. c. 466 and cases, cited and reviewed. Another case of a like import and equally decisive is Johnson v. Amer. Car & Fndry. Co., 259 S. W. 442, in which the writer had occasion to review and discuss the matter under consideration and said:

"If we consider the testimony of defendant's witnesses alone, and interpret the same in the light of all of the other facts in the case, we encounter no difficulty in concluding that Harrison was not, as contended by the defendant, to be regarded as a fellow-servant of the plaintiff. While working together, the plaintiff was under Harrison's orders, so far as the conduct of the particular work in which they were employed at the time of the injury was concerned. If one servant is given authority to direct and control other servants in a certain branch of the master's business he is not a fellow-servant with the others. [State ex rel. Duval v. Ellison, 285 Mo. 1. c. 541, 223 S. W. 651 and cases; Montgomery v. Payne (Mo. App.), 228 S. W. 842; Loretta v. Columbia Can Co. (Mo. App.), 246 S. W. 997.]"

The question received a terse and decisive determination in Freese v. Rogers-Schmitt Wire & Iron Co., 274 S. W. (Mo.) 1. c. 779, as follows:

"Where the master gives to a person power to superintend, control and direct the men engaged in the performance of work, such person is as to the men under him a vice-principal, and it can make no difference whether he is called a superintendent, conductor, boss or foreman, (BLACK, J., in Miller v. Railroad, 109 Mo. 350, 356, 19 S. W. 58, 59, 32 Amer. St. Rep. 673."

The rule announced in these cases is of course elementary and they are cited to show that the conclusions reached therein are based upon a like state of facts to those in the instant case. From all of which it is established by parity of reasoning that the status of Barnickel was that of a vice-principal.

III. It is contended, however, notwithstanding that status, it was not within the scope of Barnickel's authority to furnish the plaintiff with a safe place in which to work or to warn him of impending danger. The soundness of this contention, either in reason or upon a precedent, is subject to serious question. Barnickel's status as a vice-principal having been established he became charged with the duty to exercise ordinary care to afford the plaintiff a reasonably safe place to work and to warn him of impending danger. It will not do to say that Barnickel's control and supervision over plaintiff, as exercised, were confined to co-ordinating their work. This is too narrow a construction of the evidence. Barnickel's authority was not so limited. When the general foreman, Kimes, put plaintiff to work under Barnickel he said to the latter: "Here's a ripper for you; show him what you want him to do," and to plaintiff: "You will get your orders from Nick. Do as Nick tells you." This was no limited grant of authority to give orders only as to "co-ordination of the work," but was an unqualified grant of authority to give orders generally—not merely some orders —but all the orders that plaintiff was to receive. The evidence further shows that during the progress of the work plaintiff got all of his orders for the work from Barnickel, and from no one else. In the light of that evidence it may not reasonably be said that Barnickel's authority can be pared down to merely controlling the plaintiff in the "co-ordination of the work." When the defendant entrusted Barnickel with the responsibility of controlling the plaintiff in the performance of his work, the defendant thereby delegated to Barnickel, automatically and as a matter of law, the duty to exercise ordinary care to keep plaintiff's place of work reasonably safe.

In Johnson v. Amer. Car & Fndry. Co., supra, having demonstrated that one Harrison was a vice-principal over the plaintiff, we held:

"By virtue, therefore, of the authority conferred upon and exercised by Harrison, his acts became, in law, those of the master, whose duty it was to exercise ordinary care to see that the method in which the work was being performed did not render the place of its per-

formance unsafe to the plaintiff. [Dayharsh v. Ry. Co., 103 Mo. l. c. 576, 15 S. W. 554, 23 Am. St. 900.]''

And in Freese v. Rogers-Schmitt Wire & Iron Co., supra, Judge RAGLAND quotes with approval the following language from the opinion of Judge BLACK in Miller v. Railroad, 109 Mo. l. c. 357:

''It is one of the absolute duties of the master to use ordinary care to avoid exposing the servant to extraordinary risks; and it is also the duty of the master to use ordinary care and diligence to provide the servant a safe place at which to work. The master, by appointing a foreman or other person to superintend work, with power to direct the men under him, when and how to do it, thereby devolves upon such person the performance of those duties personal to the master.''

The similarity of the facts in the Miller case to those in the case at bar is as nearly identical as cases can well be.

In Bender v. Kroeger Grocery Co., 310 Mo. 488, 496, 276 S. W. l. c. 407-408, the plaintiff entered a trailer to unload it, and while so doing he was injured through the negligence of the driver of the truck, in detaching the trailer from the truck. The fellow-servant rule was held inapplicable, on the ground that negligence was a breach of the master's non-delegable duty to keep plaintiff's place of work reasonably safe. In speaking for the court Judge BLAIR said:

''In this case the plaintiff was directed to enter the trailer and remove the empty bread trays. Such trailer was his place of work at the time, and the duty of the defendant to exercise ordinary care to keep such place reasonably safe while plaintiff was engaged in working therein at once attached, and that duty was a non-delegable one. In directing Rufgardner to detach the tractor and move it away from the trailer, it was the duty of defendant to see that Rufgardner did not perform his work negligently. He performed that act, which affected the security of the place wherein plaintiff was instructed to work, in a negligent manner. For that negligence defendant was liable, regardless of whether or not Rufgardner was ordinarily a fellow servant of the plaintiff.''

From all of which the well-established rule that the non-delegable duties of the master to furnish the plaintiff a safe place to work and to give him warning of an impending danger, devolved upon Barnickel as within the scope of his duty as a vice-principal.

A like rule as to the extent of a vice-principal's authority may be found in the following cases: Dayharsh v. Hannibal, etc., Ry. Co., 103 Mo. l. c. 576; Cook v. Atlantic Portland Cement Co., 214 Mo. App. l. c. 607; State ex rel. Duvall v. Ellison, 283 Mo. l. c. 542; Strother v. Milling Co., 261 Mo. l. c. 16.

IV. The defendant contends that there is no evidence that Barnickel ever gave the plaintiff an order concerning the oiling of

1034

the saw and hence that this duty cannot be included either in the power conferred on Barnickel by the defendant or exercised by him over the plaintiff. Without burdening this opinion with reasons to sustain the conclusion that an order to oil the saw was within the purview of the vice-principal's powers and a part of the plaintiff's duties, it will suffice to say that the uncontradicted testimony of the plaintiff in that regard is as follows:

"He" (Barnickel) "said to oil the saw twice a day, to oil the whole saw of a morning just after seven o'clock, and just after the whistle blew at twelve-forty to oil the main bearings of the saw."

Not only was the order to oil the saw given to the plaintiff by Barnickel but a like order was given to the plaintiff by the general foreman as is shown by the following testimony of the plaintiff: "Well, after he" (Kimes) "told me about operating the saw and that I would get my orders from Nick" (Barnickel) "he said: 'Always oil the saw of a morning and just after the whistle blows at twelve-forty.'"

Whatever merit there may be in the defendant's contention in this regard under a different state of facts, it is wholly lacking in this case in the light of the foregoing testimony.

V. Barnickel was a vice-principal. As such he was clothed with power by the defendant to give to the plaintiff orders as to all phases of the latter's work. The non-delegable duty, therefore, of the defendant to furnish the plaintiff with a safe place to work and to warn him of impending danger devolved upon Barnickel and his negligence as vice-principal was that of the defendant. It was clearly the scope of his authority to start the machinery. Without this power he could have exercised no such control over the plaintiff and the other employees as that shown to have been exercised by him. The evidence is ample to sustain the conclusion that he was indifferent to or regardless of the result of his act in starting the machinery or, in short, negligent. For this negligence the defendant must be held answerable.

The action of the trial court, therefore, in sustaining a demurrer to the plaintiff's evidence and in compelling the plaintiff to take an involuntary nonsuit is reversed and the case is remanded for a new trial. All concur, except *Ragland* and *Blair, JJ.*, who dissent.